# EXHIBIT C

Schedule for 1120PC

PRINCIPAL LIFE INSURANCE COMPANY
f/k/a Principal Mutual Life Insurance Company
711 High Street
Des Moines, IA 50392-0350

EIN 42-0127290

AMENDED RETURN - CLAIM FOR REFUND
Taxable Year 1998

As shown on Amended Return and supporting schedules attached, Taxpayer hereby makes claim for refund in connection with federal income taxes paid, plus deficiency interest paid with respect to the portion of such overpayment paid pursuant to revenue agent's adjustment and subsequent assessment, plus statutory interest. thereon as allowable by law.

The claim which is made as aforesaid, computed as follows:

| | | |
|---|---|---|
| Tax paid with or before filing of original return | 189,529,028.00 | |
| Less: | | |
| Tax refund received 1998 tax audit | (4,724,396.00) | |
| Tax refund received 2001 Form 1139 | (145,890,387.00) | |
| Tax Overpayment Credited to 1999 Estimated Tax | (2,978,275.00) | |
| Net Tax Paid | | 35,935,970.00 |
| Tax per line 31, Consolidated 1120 - Claim for Refund | 33,749,521.00 | |
| Correct amount of tax, as computed by taxpayer | | 33,749,521.00 |
| TAX REFUND CLAIM | | ($2,186,449) |

CLAIM FOR REFUND

Form **1120** U.S. Corporation Income Tax Return OMB No. 1545-0123

Department of the Treasury Internal Revenue Service

For calendar year 1998 or tax year beginning ________, 1998, end. ________, 19__ **1998**

▶ Instructions are separate. See page 1 for Paperwork Reduction Act Notice.

A Check if a:
1 Consolidated rtn. (attach Form 851) X
2 Personal holding co. (attach Sch. PH)
3 Personal service corp. (as defined in Temporary Regs. sec. 1.441-4T -- see instructions)

Use IRS label. Otherwise, print or type.
Name: Principal Mutual Holding Co. & Subsidiaries
No., street, and room or suite no.: 711 High Street
City/town, state, and ZIP code: Des Moines Ia 50392

CLAIM FOR REFUND

B Employer identification no. 42-1476365
C Date incorporated 06/22/1998
D Total assets 105,018,072,630

E Check applicable boxes: (1) Initial return (2) Final return (3) Change of address

| | Line | Description | | | Line | Amount |
|---|---|---|---|---|---|---|
| Income | 1a | Gross receipts/sales 19,201,238,900 b Less returns and allowances 0 c | | | 1c | 19,201,238,900 |
| | 2 | Cost of goods sold (Schedule A, line 8) | | | 2 | 0 |
| | 3 | Gross profit. Subtract line 2 from line 1c | | | 3 | 19,201,238,900 |
| | 4 | Dividends (Schedule C, line 19) | | | 4 | 505,464,089 |
| | 5 | Interest | | | 5 | 3,448,334,787 |
| | 6 | Gross rents | | | 6 | 401,976,399 |
| | 7 | Gross royalties | | | 7 | 0 |
| | 8 | Capital gain net income (attach Schedule D (Form 1120)) | | | 8 | 0 |
| | 9 | Net gain or (loss) from Form 4797, Part II, line 18 (attach Form 4797) | | | 9 | 1,354,107 |
| | 10 | Other income (see instructions -- attach schedule) STATEMENT 1 - OTHER INCOME | | | 10 | 694,023,593 |
| | 11 | **Total income** Add lines 3 through 10 | | | 11 | 24,252,391,875 |
| Deductions (See instructions for limitations on deductions.) | 12 | Compensation of officers (Schedule E, line 4) | | | 12 | 0 |
| | 13 | Salaries and wages (less employment credits) | | | 13 | 661,898,710 |
| | 14 | Repairs and maintenance | | | 14 | 1,349,395 |
| | 15 | Bad debts | | | 15 | 7,630,911 |
| | 16 | Rents | | | 16 | 90,134,191 |
| | 17 | Taxes and licenses STATEMENT 2 - TAXES | | | 17 | 164,354,635 |
| | 18 | Interest | | | 18 | 247,402,183 |
| | 19 | Charitable contributions (see instructions for 10% limitation) | | | 19 | 72,378,108 |
| | 20 | Depreciation (attach Form 4562) | 20 | 105,488,700 | | |
| | 21 | Less depreciation claimed on Schedule A and elsewhere on return | 21a | 0 | 21b | 105,488,700 |
| | 22 | Depletion | | | 22 | 0 |
| | 23 | Advertising | | | 23 | 47,904,831 |
| | 24 | Pension, profit-sharing, etc., plans | | | 24 | 16,931,835 |
| | 25 | Employee benefit programs | | | 25 | 87,572,233 |
| | 26 | Other deductions (attach schedule) STATEMENT 3 - OTHER DEDUCTIONS | | | 26 | 22,267,860,610 |
| | 27 | **Total deductions** Add lines 12 through 26 | | | 27 | 23,770,906,342 |
| | 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | | 28 | 481,485,533 |
| | 29 | Less: a Net operating loss deduction (see instructions) | 29a | 453,832 | | |
| | | b Special deductions (Schedule C, line 20) | 29b | 417,956,058 | 29c | 418,409,890 |
| Tax and Payments | 30 | **Taxable income** Subtract line 29c from line 28 | | | 30 | 63,075,643 |
| | 31 | **Total tax** (Schedule J, line 12) | | | 31 | 33,749,521 |
| | 32 | **Payments:** a 1997 overpayment credited to 1998 | 32a | 0 | | |
| | | b 1998 estimated tax payments | 32b | 147,700,000 | | |
| | | c Less 1998 refund applied for on Form 4466 | 32c | 0 | | |
| | | d Bal | 32d | 147,700,000 | | |
| | | e Tax deposited with Form 7004 | 32e | 41,829,029 | | |
| | | f XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | 32f | -153,593,058 | | 0 SEE STATEMENT |
| | | g Credit for Federal tax on fuels (attach Form 4136). See instructions | 32g | 0 | 32h | 35,935,970 |
| | 33 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ | | | 33 | 0 |
| | 34 | **Tax due** If line 32h is smaller than the total of lines 31 and 33, enter amount owed | | | 34 | 0 |
| | 35 | **Overpayment** If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | | | 35 | 2,186,449 |
| | 36 | Enter amount of line 35 you want: **Credited to 1999 estimated tax** ▶ 0 **Refunded** ▶ | | | 36 | 2,186,449 |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. Principal Ins Co as agent for Principal Mutual Ho.Co.

Lillian Chen (signature) — 6/27/03 — Vice President Tax

Signature of officer: Lillian Chen Date Title

**Paid Preparer's Use Only**

Preparer's signature ▶ Date Check if self-employed Preparer's SSN

Firm's name (or yours if self-employed) and address ▶ EIN ▶ ZIP code ▶

EXHIBIT C
PAGE 1.1

# PRINCIPAL LIFE INSURANCE COMPANY

## TAX YEAR 1998
## $1,225,216

## CODE SECTION 453A - INTEREST ON DEFERRED TAX LIABILITY

Taxpayer claims refund based on removal of additional tax on the interest on a deferred tax liability on an installment sale under section 453A of the Code. Upon audit, the examining agent assessed additional tax attributable to the interest on the deferred tax liability on an installment sale. For the reasons set forth below section 453A is inapplicable to this transaction and the additional tax related to that interest should be removed.

### FACTS

On December 20, 1991, Principal Life Insurance Company ("Principal Life") sold commercial mortgage loans to Prudential Insurance Company of America ("Prudential") and deferred the gain realized under the installment sale provisions of Section 453. On December 23, 1991, Principal Life sold the installment notes to a wholly owned subsidiary, Principal FC, Ltd., triggering the deferred gains under section 453B. The examining agent proposed computing interest under section 453A on the deferred tax liability arising from the installment sale of the commercial mortgage loans to Prudential on December 20, 1991 and assessed additional tax related to that interest. Principal Life disagrees with this adjustment and makes this claim for refund.

### ANALYSIS

In the agent's notice of proposed adjustments, he stated that even though the installment obligation was sold in a deferred intercompany transaction, it remained an obligation subject to section 453A. Under IRC §453A(b), section 453A applies only to installment obligations that are outstanding at the close of a taxable year and only if all of such obligations exceed $5,000,000. It further provides that all members of the same controlled group are treated as one person for the purposes of determining whether section 453A applies. Under section 453B, however, the disposition of the installment sale obligation to Principal FC, Ltd., precludes the application of section 453A to this transaction.

Section 453B(a) provides that:

> If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and -



EXHIBIT C
PAGE 2

(1) the amount realized, in the case of satisfaction other than face value or sale or exchange, or

(2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

Under section 453B when Principal Life sold the installment obligation to Principal FC, Ltd., the deferred gain was triggered, Principal Life was no longer the owner of an installment obligation and Principal FC became the holder of a note receivable. Section 453A only applies to installment obligations. Because the obligation in the hands of Principal FC, Ltd., is a note receivable, the fact that Principal Life and Principal FC, Ltd., are treated as one person is irrelevant because the obligation is no longer one falling within the definition of an installment obligation to which section 453A applies.

The deferred gain which Principal Life would have recognized under section 453B continues to be deferred under Treasury Regulation section 1.1502-13 as the sale to the subsidiary constitutes a deferred intercompany transaction and will be recognized as the payments are received by Principal FC, Ltd., from Prudential. Treasury Regulation section 1.1502-13(e)(1) states:

> If an installment obligation (within the meaning of section 453(d)) is transferred in a deferred intercompany transaction, then on each date on which the obligation is satisfied the selling member shall take into account an amount equal to the deferred gain or loss on such transfer, multiplied by a fraction, the numerator of which is the portion of such obligation satisfied on such date, and the denominator of which is the aggregate unpaid installments immediately after the deferred intercompany transaction.

The examining agent cited to Treasury Regulation section 1.1502-13(m)(3), example 2, item (iii), in support of the application of section 453A to this transaction. This example is not helpful in our situation, as it involves a different set of facts. In the example, a subsidiary sells property to its parent company which then sells the property to an unrelated third party in return for an installment obligation over $5 million, causing section 453A to be applied. In the transaction at issue, Principal Life received an installment obligation from a third party which it then sold to its subsidiary in a transaction in which gain would have been recognized but for the intercompany transaction rules, which cause the gain to continue to be deferred. In example 2, the sale is from the control group to an outside party whereas in this case the installment sale occurs between the outside party and Principal Life and the obligation is then sold by Principal Life to its subsidiary. The taxpayer does not understand why the result should differ.

That section 453A is inapplicable to the current situation is further shown by final regulations under section 1502, which were issued on July 12, 1995, to address the specific issue in question. Under

Treasury Regulation section 1.1502-13(m), Example 6, section 453A is made applicable to transactions such as the present situation occurring on or after July 12, 1995. The issuance of these regulations further amplifies that at the time of this transaction, section 453A was not applicable to the transaction and the examining agent's application of section 453A to the transaction is incorrect. If section 453A was applicable to the present situation in 1992 and 1993, there would have been no reason to issue the new regulations.

CONCLUSION

Neither section 453A nor then current Treasury Regulation section 1.1502-13 provides any basis for applying the interest charge on the sale of installment obligations to Principal FC, Ltd. Section 453A contains a single employer rule designed to consolidate all qualified installment obligations held by consolidated members for purposes of the $5,000,000 threshold, but is inapplicable where the installment obligation has been sold and the gain triggered under section 453B. The intercompany transaction regulations in effect at that time provided for the restoration of gain from the intercompany sale of the installment obligations but provided only a limited application of section 453A in a factual situation not applicable to Principal Life. It was not until final regulations were issued under section 1502 that the application of section 453A was broadened to include the type of transaction Principal Life executed in 1991. These regulations, however, are generally effective for transactions occurring in tax years beginning on or after July 12, 1995. Because section 453A is clearly inapplicable to this transaction, Taxpayer hereby requests a refund of $1,225,216 for tax year 1998 based upon removal of the additional tax on the interest on the deferred tax on the installment sale under section 453A of the Code.

PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 1998
$1,117,654

CUSTODIAL SHARE RECEIPTS

Taxpayer claims a refund based on the characterization of the custodial share arrangements as an interest in equity. The agent characterized the custodial share arrangements as a debt instrument subject to the original interest discount rules.

Facts

Principal Life Insurance Company ("Principal Life") entered into four Custodial Share agreements. The agreements were structured such that Principal Life received Custodial Share Receipts ("CSRs") and Custodial Dividend Receipts ("CDRs"). In general, each CSR evidences ownership of a certain number of shares issued by a regulated investment company ("RIC") exclusive of the right to receive dividends for a period of time. At the end of the specified term, the CSRs could be redeemed for shares in the underlying RIC. The CDRs provided that the holder of the CDR would receive dividends on the shares of the RIC after a specified term had expired.

Principal Life concluded that current tax law requires recognition of any gross increase due to adjustment in the book value of a CSR only when a recognition event occurred, such as a sale or other disposition. Principal Life based this conclusion on the fact that the CSRs constitute ownership rights in a specified number of common shares of a RIC, which represents equity and not debt for tax purposes. Thus, the original issue discount ("OID") rules under sections 1271-1275 and section 1286 were inapplicable.

The agent disagreed, citing as his primary position that each CSR establishes a debt between the depositor and the taxpayer. According to the agent, the depositor, also identified as the initial holder of the CDR, is the owner of the shares, receives the dividend income on the shares, and issues a deemed debt instrument (the CSRs) as a means of financing the purchase of the shares. The shares held in custody secure the CSRs, resulting in a non-recourse collateralized loan transaction.

Alternatively, the agent argues that (1) Principal could be treated as having purchased the entire interest in the RIC shares, including the right to all future dividends, in exchange for cash and additional payments equal to the dividends on the RIC shares; or (2) the custodial arrangement could be treated as a partnership resulting in the reallocation of income attributable to the underlying RIC shares.

Principal strongly objects to the characterization of the CSRs as a collateralized non-recourse obligation on the basis that the agent's position is contrary to the

law, arbitrary and without substance. Principal also objects to the agent's alternative argument that Principal should be taxed on the dividends received by the CDR holder on the basis that case law permits a seller of stock to reserve a term interest in the dividend income from the stock. Therefore, the assignment of income doctrine does not apply. Finally, Principal objects to the characterization of the custodial arrangement as a partnership. The transaction is, in substance, a purchase of stock with a reservation of dividend income. The custody agreement was for the convenience of facilitating the security arrangement but was not necessary for this purpose. Therefore, at most, the custodial arrangement can only be viewed as an investment trust and not as a partnership under the default rules for business entities.

Analysis

The essence of the agent's arguments is summarized below:

> The issue in the instant case turns on whether the Taxpayer acquired ownership of the MMF shares upon the purchase of the CSRs. If the depositor retained ownership of the shares, then the depositor is taxed on all dividend income earned on the shares and the taxpayer is considered to have loaned funds to the depositor in the amount of the purchase price of the CSRs. If the depositor transferred ownership of the shares, then the taxpayer is taxed on all dividend income earned on the shares and is deemed to have borrowed from the depositor, an amount equal to the present value of the anticipated dividends over the restricted dividend period (the CDS value).[1]

*I. The CSRs are not collateralized non-recourse debt instruments.*

A. Substance over form analysis

In *Frank Lyon Company v. United States,*[2] the Supreme Court articulated the basic principle the Government is to follow regarding multiple-party transactions:

> [w]here, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, which is imbued with tax-independent considerations, and which is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the

[1] Page 13 of Form 886A 5701 FP 03
[2] 435 U.S. 561, 584 (1978).

> traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.[3]

This principle carries all the more weight in light of the fact that it was applied within the context of a challenge by the Service to recast a sale-leaseback transaction as a mere financing arrangement. Its applicability in the current situation is undeniable.[4]

This principle has two related prongs. The first involves the allocation of rights and duties between the parties. If the CSR transactions involve independent parties negotiating at arms'-length basis, are compelled by business or regulatory considerations, are imbued with tax-independent considerations, and are not solely shaped by tax-avoidance features that have meaningless labels attached, the Government should honor the allocations of rights and duties by the parties to the CSR transactions. These rights and duties are important with respect to the second prong—determining whether the substance of the transaction follows the form. Where the underlying substance follows the form, the Government is not at liberty to recast the form as something else, but must respect the form adopted by the parties.

The agent has not challenged the rights and duties allocated between the parties. As previously documented, the CSR transactions involved independent parties, were negotiated at an arm's length, fulfilled valid business and regulatory purposes, and were not solely shaped by tax-avoidance features. The fact that the CSRs have favorable tax attributes does not give the Government carte blanche to deny those attributes. As the Supreme Court stated in *Frank Lyon*:

> The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.[5]

---

[3] *Frank Lyon Company v. United States*, 435 U.S. 561, 580 (1978).

[4] The principles of *Frank Lyon* have been cited in numerous contexts. For example, *Compaq Computer Corporation*, 277 F.3d 778 (5th Cir. 2001) ["Where...there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties."]; *United Parcel Service v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001) ["The kind of "economic effects" required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party. See *Frank Lyon Co*...]; and *Salina Partnership LP v. Commissioner*, TC Memo 2000-352 (2000) ["However, to be accorded recognition for tax purposes, a transaction generally is expected to have "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached."].

[5] *Frank Lyon Company v. United States*, 435 U.S. 561, 565 (1978).

Although the CSR transactions are clearly documented as the purchase of RIC shares held in custody, the agent has chosen to recast the CSRs as a deemed financing between Principal and the depositor. In general, whether a transaction is a sale or financing is a matter of economic substance. As stated in *Frank Lyon*:

> In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed.[6]

It is important to note, however, that where the substance of a transaction is that of a true sale, the Government does not have the discretion, absent statutory authority, to recast a transaction in the form of a deemed financing. Only in the following narrow instances can the Government statutorily recharacterize the assignment of future income as a borrowing secured by the right to the future income, not a sale. First, production payments carved out of mineral property are required to be treated as if they were mortgage loans on the property and not as an economic interest in the mineral property. Section 636(a). Second, arrangements involving fast-pay stock are recast as financing arrangements directly between two parties.[7]

Neither section 636(a) nor section 1.7701(1)-3 applies in this case. Therefore, if the substance of the CSR transactions is that of a sale/purchase, the Government is obligated to respect the form of the transaction.

B. <u>Agent's primary position</u>

The government's primary position is that the CSRs establish a debt between the depositor and the taxpayer. As stated by the agent, the cash flows of the transaction are *similar* to that of a zero coupon bond;[8] the CSRs have the *characteristics* of a non-recourse collateralized loan.[9] The agent attempts to support his position through an analysis of factors used to determine (1) whether an instrument is debt or equity under the guidance of Notice 94-47[10] and (2) whether the benefits and burdens of ownership have passed using the factors

---

[6] *Frank Lyon Company v. United States* 435 U.S. 561, 573 (1978). See also *Corliss v. Bowers*, 281 U.S. 376, 378 (1930); *Commissioner v. Tower*, 327 U.S. 280, 291 (1946); *Helvering v. Lazarus & Co.* 308 U.S 252, 255 (1939).

[7] In 1993, Congress granted Treasury the authority to prescribe regulations recharacterizing any multiple-party financing transaction as a transaction directly among any two or more parties. To date, Treasury has only issued regulations under this authority dealing with financing arrangements involving fast-pay stock which can be found in Treas. Reg. § 1.7701(l)-3. Moreover, both situations were identified as exceptions to current law as part of a 2001 Clinton budget proposal to characterize a strip of a right to receive future income from income-producing property.

[8] Form 886-A 5701 FP 03, page 5.

[9] Form 886-A 5701 FP 03, page 5.

[10] 1994-1 C. B. 357.

established in case law.[11] The agent asserts the following factors support his theory that the CSRs constitute a collateralized non-recourse obligation:

**Notice 94-47 Factors**

1. The CSRs are deemed to have a definite maturity date.
2. The holder of the CSR has the right, indirectly, to enforce the payment of principal and interest.
3. The CSRs are not subject to the claims of the depositor's creditors.
4. The investment in CSRs during the restricted dividend period is accounted for as an investment in zero coupon bonds.

***Grodt & McKay*** **Factors**

5. Title to the MMF shares does not pass to the taxpayer until after the expiration of the restricted dividend period.
6. The taxpayer does not have an equity interest in the underlying MMF shares.
7. The taxpayer does not pay any income or property taxes.
8. The taxpayer is not at risk of the depositor's business or the operations of the underlying MMF.
9. The taxpayer does not participate in the profits from the operations of the depositor, the custodian or the MMF, during the restricted dividend period.

C. Economic substance and the rights and duties of the parties

Before examining these factors to see whether they support the agent's position, it is important to identify the basic premise underlying the agent's analysis of these factors. As mentioned earlier, this premise is that the substance of the transaction is a collateralized non-recourse obligation.[12] If this premise is shown to be false from the start, most of the agent's arguments are rendered non sequiturs.

According to the Supreme Court in *Frank Lyon,* it is not merely sufficient to argue that an instrument bears a resemblance to collateralized non-recourse debt. The rights and duties assumed by all parties to the transaction must be examined to see if such an arrangement was, in substance, made.

In applying a traditional analysis of substance over form, the contractual rights and duties of the parties to the transaction are first identified. Then, the nature of such rights and duties are examined to see if they are shaped by business realities

---

[11] *See, e.g., Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221 (1981).
[12] "The CSR transaction has the characteristics of a non-recourse collateralized loan..." Form 886A 5701 FP 03, page 5; the "...obligation is similar to a non-recourse collateralized obligation..." Form 886A 5701 FP 03, page 9; "The CSR instruments possess many attributes of debt and it is determined that the substance of the transaction is one of a collateralized debt." Form 886A 5701FP 03, page 11.

and tax-independent considerations. Finally, the substance of such rights and duties are examined to see if they correspond to the form.

This is not the approach taken by the agent. The agent first concludes that the transaction is a collateralized non-recourse debt transaction. Based on this conclusion, the agent points out similarities with debt instruments to support his claim that the CSRs are collateralized non-recourse debt instruments. However, the agent's conclusion is no better than the assumptions on which it is based. If the actual duties and rights of the parties, as evidenced by the transaction documents, fail to support the agent's analysis, then the agent's conclusion is also false.

An examination of the transaction must begin with an examination of the contract(s) between the parties. As the Tax Court stated in *Wood Process Company*,

> But the question of the legal effect of the contract upon income tax depends upon the contract itself, rather than upon circumstances motivating its execution.[13]

Also, in *Frank Lyon:*

> [A]s the Court has said in the past, a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred.[14]

The agent argues that the transaction could be viewed as a collateralized non-recourse debt issuance. Such speculation, however, carries no weight. What matters is what is actually contained within the four corners of the Custody Agreement.[15] An examination of the provisions of the Custody Agreement clearly demonstrates that the transaction that occurred granted ownership of common shares in a RIC to the holder of the CSRs (i.e., Principal Life) and a security arrangement favoring the holder of the CDRs (i.e., the Depositor).

According to the Custody Agreement and CSR, Principal Life is the owner of the RIC shares held by the Custodian.[16] As such, Principal Life has all the traditional rights of ownership including voting rights,[17] the right to income from the shares

---

[13] *Wood Process Company v. Commissioner*, 2 TC 810 (1943).
[14] *Frank Lyon Company v. United States* 435 U.S. 561 (1978).
[15] The Custody Agreement also contains the Forms of Opinions of Counsel and Forms of the CSR and CDR.
[16] CSR; Custody Agreement, Section 2.2(a).
[17] Custody Agreement, Section 2.5(a), providing for such rights to be exercised through the Custodian. Note that the Custodian is merely the nominal holder for the CSR holder; Section 2.4(g) provides that the Custodian is permitted to notify the Issuer of the identity of any Holder of CSRs if and to the extent necessary to permit the Issuer to comply with the requirements of the Investment Company Act of 1940.

after the restricted dividend period,[18] the right to liquidation proceeds representing any return of capital on the shares,[19] and the right to transfer the shares for valuable consideration.[20].

The Custody Agreement explicitly states that it is intended to create a security arrangement as well as a paying agency.[21] The terms of the security arrangement provide that during the restricted dividend period, the holders of the CSRs have no right to cause the redemption of any of the shares.[22] Holders of the CSRs agree not to vote affirmatively for the dissolution of the Issuer or any change in the investment objectives, etc., which could cause the Issuer not to qualify as a money market fund under Rule 2a-7 of the Investment Company Act.[23] The security arrangement is effective only for the restricted dividend period; after this time, for purposes of the Custody Agreement, the CDRs shall no longer be outstanding,[24] and the CSR holder shall have the right to withdraw the shares[25] and terminate the custodial arrangement.[26]

Most revealing is the ability of the CSR holder to terminate the custodial arrangement by directly assuming the obligations of the Custodian with respect to the corresponding holder(s) of CDRs.[27] The CSR holder accomplishes this by delivering the CSRs to the Custodian for cancellation and delivering documentation to the CDR holders sufficient to provide such holders with a valid perfected, first priority security interest in the shares acceptable to the CDR holders in their sole discretion.

It is clear from these provisions that the real economic benefit of the custodial arrangement is derived by the CDR holder who receives a security interest in the shares to guarantee payment of the dividends during the restricted dividend period. The only benefit derived by the CSR holder from the custodial arrangement is convenience. Before any prospective purchaser of the RIC shares can acquire an interest in those shares through the CSR, the purchaser must first agree to the terms of the Custody Agreement granting a security interest in those shares to the CDR holder.

In summary, the form and substance of the Custody Agreement and the sale of the CSRs are to transfer ownership rights in the RIC shares to the CSR Holder subject to a security interest in the RIC shares by the CDR holder. That this is truly the

---

[18] CSR; Custody Agreement, Section 2.2(b).
[19] CSR; Custody Agreement, Section 4.1(b).
[20] CSR; Custody Agreement, Section 2.4(b).
[21] 2nd Whereas, Page 2, Custody Agreement.
[22] Custody Agreement, Section 2.2(c).
[23] Custody Agreement, Section 2.5(b).
[24] Custody Agreement, Section 2.2(b).
[25] Custody Agreement, Section 2.6(a).
[26] Custody Agreement, Section 2.6(b).
[27] Custody Agreement, Section 2.6(c).

substance of the transaction can be seen in an analysis of the factors identified by the agent in support of his position.

D. Analysis of the factors identified by the Agent

As evident by the transaction documents, the CSRs were issued primarily for convenience (and indeed can even be cancelled without affecting the economic substance of the transaction). Because the CSRs have no real substance or meaning apart from ownership of the underlying shares, it could be argued that an analysis of the various debt/equity factors such as maturity dates, the right to enforce the payment of principal and interest, subordination to the claims of general creditors, etc., does not carry any more weight than the instrument itself does. It is one thing to analyze an instrument that has substance; it is another thing to analyze an instrument that is ephemeral and transient in nature.

However, because the CSRs impart real legal rights and duties during the period of time they are in existence, they should be examined to see whether those rights and duties (i.e., the substance) match the form of the instrument—ownership of the underlying RIC shares. An examination of the particular factors identified by the agent as supporting debt treatment, *in view of the contractual and economic rights and duties of the parties to the transaction*, clearly supports the substance of the CSRs as ownership of common shares in a RIC.

**1. Maturity date**

The agent argues that the CSRs have a definite maturity date because the shares are held in custody for the CSR holder and that it is reasonable to assume that the underlying shares will retain their $1.00 stated value. The real substance of the matter is that Principal Life is the owner of those shares. Although held indirectly, the CSRs do not confer anything other than ownership rights in the shares with a reservation of income. This is made clear by the fact that Principal Life has the option to terminate the custodial arrangement and withdraw the shares subject to a perfected first priority interest. Because the CSRs may or may not be outstanding at the end of the restricted dividend period, any reference to a deemed "maturity date" is meaningless.

In analyzing whether the CSRs provide for an unconditional promise to pay a sum certain on a fixed maturity date, the agent points to the fact that the RIC expects to maintain a constant $1 per share stated value. Notwithstanding the fact that Principal Life expects to receive RIC shares worth $1 apiece, Principal Life remains entirely exposed to the operations of the RIC to maintain this value as evidenced by the following terms of the CSRs and the Custody Agreement:

- The CSRs evidence ownership of the shares and the right to receive all dividends on the shares after the restricted dividend period.[28]

[28] CSR, page 1.

- The CSR holder is entitled to all amounts characterized as a return of capital both during and after the restricted dividend period.[29]
- In the event of any nonpayment in respect of the shares, the CSR holder is entitled to proceed against the Issuer in any manner deemed appropriate.[30]
- The sole obligor with respect to the shares is the Issuer.[31]

Economically, the CSRs do not confer more rights or fewer risks on the holder than if the holder held the RIC shares outright. The fact that there is low risk in the transaction does not mean that there is no risk. The agent appropriately cites the funds' prospectuses as disclaiming any guarantee that the fund will always maintain a $1 per share price. Although remote, there is still risk that the fund's asset value per share may drop below this amount. The terms of the Custody Agreement and CSRs reflect this risk and assign it exclusively to the CSR holder.

In summary, the fact that the RIC expects to maintain a $1 per share value does not mean that this value is guaranteed and is not any more indicative of a maturity date than if Principal Life held the shares directly. It is clear that any holder of the RIC shares would have reason to expect that the fund would still be valued at $1 per share, whether held directly or through a custodial arrangement. This factor does not provide any support to the agent's position.

**2. The right to enforce payment of principal and interest**

The agent argues that because the holder of the CSRs has the right to the possession and liquidation of the RIC shares held by the custodian, the CSRs are deemed to be similar to a non-recourse collateralized obligation. Therefore, the holder of the CSRs has the right, indirectly, to enforce the payment of principal and interest.

This, of course, ignores the true substance of the Custody Agreement as a security arrangement *for the benefit of the CDR holder*. The holder of the CSR has the right to the possession and liquidation of the RIC shares simply because it is the owner of those shares. The agent cites *Mapco Inc. v. United States*[32] as support for arguing that the right to receive the RIC shares gives the CSR holder an indirect right to enforce the payment of principal and interest.

Mapco, Inc., a common carrier of petroleum products through an interstate pipeline system, had a net operating loss of approximately $4.7 million that would expire by the end of 1966. In order to generate sufficient income to utilize the NOL, Mapco assigned 75% of all its pipeline revenues to Rock Creek Corporation for $4 million until such time as Rock Creek received back the principal sum of $4 million plus an amount equal to interest at the rate of 6.375%

---

[29] CSR, page 2.
[30] CSR, page 2.
[31] CSR, page 1.
[32] 556 F.2d 1107, 1110 (Ct. Cl. 1977)

per annum plus expenses. Rock Creek borrowed the sum of $4 million from Chemical Bank to acquire the pipeline revenues. The $4 million received by Mapco was used to acquire certificates of deposit from Chemical Bank. The maturity dates of the CDs corresponded with the anticipated dates for the repayment of the $4 million loan to Chemical Bank.

The U.S. Court of Claims ruled that the transaction was actually a loan rather than an assignment of future revenue in return for a lump sum payment. The court stated that various factors showed that the buyer was certain to be repaid in full and that the buyer had no dominion or control over the revenue payments and none of the usual risks or benefits associated with ownership of property. In addition, the fact that Mapco deposited the $4 million proceeds in Chemical Bank CDs implied that Mapco indirectly guaranteed repayment.

The agent argues that in similar fashion, the Depositor deposited the RIC shares with the Custodian in order to indirectly secure the Depositor's obligation with respect to the CSR holder (i.e., the deemed loan). The agent's theory thus has the holder of the CSRs standing in the shoes of Rock Creek, which was the ultimate beneficiary of the CDs issued by the bank to Mapco. If Mapco defaulted on the revenue payments, Rock Creek could defease its obligation with respect to its loan to Chemical Bank by virtue of the certificate of deposit proceeds received by the bank from Mapco.

Without belaboring the many differences between *Mapco* and the CSR transactions, the agent's use of *Mapco* to support his theory that the shares are held as collateral for the CSR holder is relevant only if, in fact, the CSR holder is the ultimate beneficiary of the collateral arrangement (i.e., stands in the same position as Rock Creek did in *Mapco)*. The Custody Agreement, however, was executed for the benefit of the CDR holder who is the true beneficiary of the security arrangement. Therefore, *Mapco* has no relevance to this situation. This factor does not support the agent's position.

One difference between *Mapco* and the current transaction is worth noting. In *Mapco*, Mapco was the original owner of the property, of which it then tried to sell part of its future revenue stream, and remained the owner of the property at the end of agreement. As discussed below under the assignment of income cases, the ownership of the RIC shares has been sold to the Taxpayer, subject to the reservation of dividends during a certain period of time. This represents a fundamental difference from the facts in *Mapco*.

**3. Lack of subordination**

The agent argues that because the RIC shares are held in a custodial account and are not subject to claims by the depositor's creditors, the CSRs are not subordinate to the claims of the general creditors of the Depositor because the

CSR holder's right to the RIC shares is superior. Again, this argument ignores the substance of the Custody Agreement as a security arrangement for the benefit of the CDR holder. Obviously, the CSR holder's rights to the regulated investment company shares are superior to that of any other party because the CSR holder is the owner of those shares and bears the risks and rewards of such ownership, as already detailed. Note that if the CDR holder goes bankrupt, the creditors of the CDR holder step into the shoes of such holder in respect of the security arrangement. Therefore, the CSR holder could actually find itself in the position of maintaining the shares as collateral for the benefit of the creditors of the CDR holder. If the CSR holder defaults on any of the obligations that it assumes under the Custody Agreement,[33] the shares could be forfeited to make payment on the dividends to be paid on the CDRs. Therefore, the shares represented by the CSRs could be subject to the claims of the general creditors of the CDR holder. This factor does not support the agent's position but rather the taxpayer's.

#### 4. Accounting treatment as a zero-coupon bond

The agent states that the intent of the parties regarding the treatment of the instruments as debt or equity for non-tax purposes is an important factor in determining whether a debtor-creditor relationship exists. According to the agent, the letter from Coopers & Lybrand concluded that the CSRs should be accounted for as "...an investment in zero coupon bonds..." during the restricted dividend period, and "...as an investment in a money market fund..." after the restricted dividend period.[34]

The agent places far too much weight on this factor. In *Frank Lyon,* the Supreme Court stated the following,

> In concluding that there is this distinct element of economic reality in Lyon's assumption of liability, we are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same...*Accounting methods or descriptions, without more, do not lend substance to that which has no substance.*[35]

The accounting method suggested by Coopers & Lybrand does not change the substance of the CSR transaction in the least. In fact, the Coopers & Lybrand memo supports the treatment of the CSRs as equity, viewing them as representing beneficial ownership of the shares via the custodial arrangement and providing the CSR holder the right to receive all economic benefits of the shares, excluding the dividends during the restricted dividend period. The accounting treatment recommended by Coopers & Lybrand is based solely on an economic similarity

---

[33] Custody Agreement, Section 2.6(c).
[34] Form 886-A 5701 FP 03, page 11.
[35] *Frank Lyon Company v. United States,* 435 U.S. 561, 577 (1978) (emphasis added).

with a zero coupon bond. As further discussed below, this does not affect the fundamental substance of the CSRs as ownership of the underlying RIC shares. Therefore little, if any, weight should be accorded the statutory accounting treatment.

**5. Passage of title**

The passage of title is one of those factors that tend to be commonly discounted by the courts. However, this factor favors the taxpayer in this situation because the shares are registered in the name of the Custodian only as nominal holder,[36] and the Custodian is permitted to notify the Issuer of the identity of any Holder of CSRs if and to the extent necessary to permit the Issuer to comply with the requirements of the Investment Company Act of 1940.[37] Further, as noted above, Taxpayer can terminate the custodial arrangement and take title directly in the RIC shares.

**6. Lack of equity interest in RIC shares**

The agent states that the holder of the CSR does not possess all the benefits and burdens of ownership of the underlying shares because (1) the CSR holder does not participate in the results of operations because all earnings are paid as dividends to the CDR holder, and (2) the holder is restricted from liquidating the shares prior to the expiration of the restricted dividend period.[38] If, as the agent argues elsewhere, Principal Life has the expectation that the RIC shares will be maintained at $1 per share, upon what can this expectation be based *other than* the successful operations of the regulated investment company? It is contradictory to insist on the one hand that the shares are reasonably expected to be $1 per share at the end of the restricted dividend period and to argue, on the other hand, that this has nothing to do with the operations of the RIC.

It is obvious from the provisions of the Custody Agreement and the CSR that the CSR holder's return is exclusively dependent on the cash flow generated by the RCI. Such cash flow arises solely as the result of the RIC's operations. During the restricted dividend period, the CSR holder is at risk that the RIC will not be able to generate sufficient earnings to maintain a $1 per share fund value and may have to liquidate at a value of less than $1 per share. After the restricted dividend period, the CSR holder is still at risk to the RIC's operations to maintain the fund value and to pay dividends. Therefore, the CSR holder's return is necessarily dependent upon the risks inherent in the RIC whether during or after the restricted dividend period.

The agent also points out that the CSR holder is restricted from liquidating the underlying shares. This ignores the fact that the CSR holder is able to benefit

[36] Custody Agreement, Section 2.5(a).
[37] Custody Agreement, Section 2.4(g).
[38] Page 11 of Form 886A 5701 FP 03.

economically from the shares by transferring the CSRs in return for valuable consideration. This is no different in principle than selling American Depositary Receipts (ADRs) representing shares of foreign stock.[39]

In summary, both of these issues support the taxpayer's position that it is the owner of the RIC shares and has assumed the economic risks and rewards with respect to those shares.

**7. The taxpayer does not pay any income or property taxes**

The agent argues that because only the CDR holder reports income from dividends paid by the underlying MMF and bears the expenses of the Custodian during the restricted dividend period, this factor favors debt treatment.

In general, "...tax is upon income as to which, in the general application of the revenue acts, the tax liability attaches to ownership."[40] Because what is owned is at dispute in this issue, the burden of tax liability can only flow from the resolution of this issue, not resolve it. Principal Life is consistent in its treatment of the CSRs by deferring the recognition of income (and thus tax) until it has sold the RIC shares, either indirectly (i.e. through the CSRs) or directly.

The Custody Agreement allocates expenses according to the benefits derived by the parties. The charges and expenses of the Custodian are payable by the CDR holder during the restricted dividend period [41] because this party receives the primary benefit of the custodial arrangement during this time. The charges and expenses of the Custodian after this period are payable by the holder of the CSRs[42] simply because the CDRs are no longer outstanding[43] and derive no further benefit from the custodial arrangement.

In addition, withholding tax on any payments with respect to any CSR is borne by the party who owns such receipt[44] and the expenses of any action incurred by the Custodian to determine the characterization of amounts received in the event of a return of capital of the shares are to be allocated on a proportionate basis among the holders of the affected CSRs to the extent of payments received by the Custodian.[45] Thus, the allocation of expenses and taxes corresponds to the economic benefits derived by the parties, consistent with the ownership rights imparted by each CSR.

Finally, as further discussed in the section dealing with the application of the assignment of income doctrine, the fact that the Depositor is the only party

---

[39] Need cite to what he is referring.
[40] *Blair v. Commissioner*, 91 F.2d 992 (2d Cir. 1937).
[41] Custody Agreement, Section 5.7.
[42] Custody Agreement, Section 5.7; Section 2.1(b).
[43] Custody Agreement, Section 2.2(b).
[44] Custody Agreement, Section 3.2.
[45] Custody Agreement, Section 5.1(d).

taxable on the dividends received during the restricted dividend period (and whom the taxpayer presumes is actually paying tax on such income as dividends and not capital gains), supports the taxpayer's position that the CDR holder has reserved the dividend income on the shares for a period of time, but not the shares themselves.[46]

**8. The taxpayer is not at risk of the Depositor's business or the MMF**

The taxpayer's exposure to the risks of the operations of the RIC has already been discussed. The taxpayer is not at risk to the Depositor's business simply because the CSRs confer ownership in the common shares of the RIC, not the Depositor. Because the CSR holders own clear distinct assets, neither party has risk with respect to the bankruptcy of the other. This does not support debt treatment. However, if the CSR holder terminates the custody arrangement during the restricted dividend period and assumes the obligations of the Custodian, the Depositor is potentially at risk to the holder of the CSRs to perform the obligations of the Custodian. This situation is contrary to the agent's position and supports the taxpayer's position.

**9. Lack of participation in the profits from the operation of the MMF**

The agent argues that the taxpayer does not participate in the profits from the operations of the Depositor, the Custodian or the MMF during the restricted dividend period. It is obvious that the CSR holder does not profit from the operations of the Depositor because the CSR holder has only obligations and no rights with respect to the Depositor. However, as discussed in detail above, the ability of Principal Life to reap a benefit of $1 per share at the end of the restricted dividend period lies exclusively on the successful operations of the RIC, and nothing else.

The agent frequently refers to the fact that because the underlying shares are expected to be redeemed at a $1.00 per share stated value, the return earned by the CSR holder is similar to that of a loan with the attendant risk characteristics.[47] This forms a significant part of the agent's argument that the CSRs are equivalent to collateralized non-recourse debt.

In *Estate of Frank D. Stranahan v. Commissioner*,[48] the taxpayer, who anticipated making a substantial interest payment in 1964 to the Internal Revenue Service, accelerated his income in that year to avoid losing the tax benefit of the deduction by assigning all of the dividends to be declared and paid to him with respect to the stock of Champion Spark Plug Company until the assignee received an aggregate

[46] See *Heminway v. Commissioner*, 44 TC 96 (1965). In referring to the taxation of dividends reserved by the seller of stock, the court stated, "As the beneficial owner [of the dividends] she is liable for, and has paid, the tax imposed on the amounts paid over by Heminway, as dividends, and not as capital gains incident to the sale of her stock."

[47] Form 886A 5701 FP 03, pages 5,8,11,14, and 15

[48] 30 TCM 1078 (1971), *rev'd* and *rem'd*, 472 F.2d 867 (6th Cir. 1973).

amount of $122,820. The amount received by the taxpayer on the sale of the future dividends was $115,000. The Service included the dividend income in the taxpayer's taxable income on the basis that the assignment was made solely for the purpose of avoiding income taxes and lacked any business substance.

In its recitation of the facts, the Tax Court stated that at the time of the alleged assignment of dividends, it was anticipated that each share of stock would pay cash dividends of 50 cents per quarter. It was determined that with the current dividend payment rate at that time of 50 cents per share of stock per quarter, $115,000 represented the present value of the right to receive the assigned dividends of $4.60 per share discounted at the then prevailing interest rate of 5 percent. In addition, the court noted that the Champion Spark Plug Company had a long and consistent record of paying dividends on its stock. Both the taxpayer and the assignee were familiar with the dividend records of Champion. The Tax Court concluded that "...the whole undertaking, though conducted in the form of an assignment of a property right, was in reality a loan to petitioner masquerading as a sale and so disguised lacked any business purpose..."[49]

In reversing the Tax Court's decision, the U.S. Court of Appeals disagreed with the Commissioner's view that the transaction was merely a temporary shift of funds and that no change in the beneficial ownership of the stock was effected and no real risks assumed by the son, stating that,

> The Commissioner also argues that the possibility of not receiving the dividends was remote, and that because this was particularly known to the parties as shareholders and employees of the corporation, no risks inured to the son. The Commissioner attempts to bolster this argument by pointing out that consideration was computed merely as a discount based on a prevailing interest rate and that the dividends were in fact paid at a rate faster than anticipated. [Footnote omitted.] However, it seems clear that risks, however remote, did in fact exist. The fact that the risks did not materialize is irrelevant. Assessment of the risks is a matter of negotiation between the parties and is usually reflected in the terms of the agreement. Because we are not in a position to evaluate those terms, and because we are not aware of any terms which dilute the son's dependence on the dividends alone to return his investment, we cannot say he does not bear the risks of ownership.[50]

Despite the fact that the CSR holder expects the value of the RIC shares to be $1 per share at the end of the restricted dividend period, such value is nevertheless dependent on the operations of the regulated investment company and is not without risk. The consideration paid for the CSRs reflects this risk. This risk is

---

[49] 30 TCM 1078 (1971), *rev'd* and *rem'd*, 472 F.2d 867 (6th Cir. 1973).
[50] *Estate of Frank D. Stranahan v. Commissioner*, 472 F.2d 867 (6th Cir. 1973).

no different than if Principal Life held the shares directly. The agent does not dispute that money market fund shares constitute equity and that the risk on these shares, just like the risk on the CSRs, is like the risk of default of a bond.[51] Economic similarities can also be drawn with respect to fixed rate preferred stock, which is priced and traded like a bond. Although it can be argued that preferred stock carries more risk than debt because of subordination, one only has to consider the situation where the capital structure consists entirely of common and preferred stock. The fact that preferred stock may be senior to all other capital still does not render it debt. Thus, the degree of risk, in and of itself, does not establish whether an instrument is debt or equity.

The Supreme Court has also upheld this viewpoint. In *Frank Lyon*, the Government argued for financing treatment based on the viewpoint that Worthen regarded the various proposals only in terms of its own cost of funds and that both Worthen and the prospective investors compared the various proposals in terms of the return anticipated on the investor's equity. In dismissing this analysis as irrelevant, the Supreme Court stated:

> But all this is natural for parties contemplating entering into a transaction of this kind. Worthen needed a building for its banking operations and other purposes and necessarily had to know what its cost would be. The investors were in business to employ their funds in the most remunerative way possible. *And, as the Court has said in the past, a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred.*[52]

Therefore, contrary to the agent's position, the taxpayer does participate in, and is at risk to, the operations of the RIC. Even though this risk may be similar to the risk on a bond, the risk is nevertheless exclusively with respect to the common shares of the RIC. This factor clearly supports the taxpayer's position.

In summary, an analysis of the factors cited by the agent in light of the provisions of the Custody Agreement and CSRs does not support the agent's theory that the CSRs are collateralized non-recourse debt instruments. Of the nine factors analyzed above, eight of the nine either support the taxpayer or do not support the agent's position. Regardless of the economic motivations of the parties, the Government cannot merely speculate on what was intended by the custodial arrangement or advance theories that bear no reality to what was actually transacted. As the Tax Court stated in *Wood Process Company*,

---

[51] But unlike a bond, the taxpayer cannot sue the RIC for $1.00 per share.
[52] *Frank Lyon Company v. United States*, 435 U.S.561, 576 (1973). (emphasis added.)

> But the question of the legal effect of the contract upon income tax depends upon the contract itself, rather than upon circumstances motivating its execution.[53]

The contract is clear and unambiguous. Principal Life acquired ownership rights in the underlying common shares of the regulated investment company and the right to receive dividends on those shares after the restricted dividend period.

*II. The taxpayer should not be treated as purchasing the entire interest in the shares.*

The agent argues in the alternative, that the taxpayer could be treated as having purchased the entire interest in the RIC shares, including the right to all future dividends, in exchange for cash and additional payments equal to the dividends on the RIC shares. The additional payments constitute payments of principal and interest on a deemed loan between the holder of the CSRs and the holder of the CDRs. The agent develops three lines of argument in support of his position.

A. Ability to strip dividends

The agent first argues that the dividend stream represented by the CDRs cannot be stripped or separated from the underlying RIC shares unless specifically permitted under the Code or regulations. The agent cites sections 305(e) and 1286 in support of his position.

The ability of taxpayers to strip the right to receive income from the property itself is well established. The Clinton Budget proposal for 2001 acknowledged this by stating

> Under current law, it may be possible for a person that holds income-producing property to separate, or "strip," the right to receive income from the property itself. For example, it may be possible for a taxpayer that holds dividend-paying stock to separate ownership of the right to receive the dividends from ownership of the stock. Similarly, it may be possible for the lessor of rental property to separate the right to receive the rent payments from the ownership of the underlying property.[54]

The budget proposal goes on to discuss the two approaches that have been developed to modify the result of certain income-stripping transactions. The first is the "coupon-stripping" approach, as codified in sections 305(e) and 1286. This approach essentially provides basis allocation rules for certain transactions to clearly reflect income. These provisions, however, do not directly or indirectly

[53] *Wood Process Company v. Commissioner*, 2 TC 810, 816 (1943).
[54] Clinton Fiscal 2001 Budget Plan, page 34.

address a taxpayer's right to separate ownership of income from property. Because of the narrow focus of these provisions, they have no application in this situation.

The second is the "deemed financing" approach as codified in section 636(a) and in section 7701(l) and the underlying regulations. As discussed earlier, these provisions are statutory exceptions that create a deemed financing between two parties in a transaction otherwise structured as a sale. Again, these provisions are limited to certain transactions and have no application in this situation. Because no statutory provision exists that modifies the tax consequences of separating ownership of dividend income from the shares of a RIC, case law determines the tax consequences of the CSR transactions.

**1. Assignment of income doctrine**

The assignment of income doctrine essentially denies a taxpayer the ability to assign to another party the tax consequences of income that the taxpayer has earned or controls, gratuitously or without adequate consideration.[55] However, where the "tree" is transferred along with the "fruit," the tax burden is also transferred.[56]

There are several important corollaries to the assignment of income doctrine. The first is that where the taxpayer assigns the right to future income to another party for adequate consideration, the taxpayer will be taxed on that income as having currently received it.[57]

A second corollary to the assignment of income doctrine, and one which the agent omits in his write-up, is that *where the taxpayer neither earns the income nor controls the income, the taxpayer cannot assign the income, either gratuitously or for consideration.*[58]

In *Bettendorf v. Commissioner*,[59] Catherine Bettendorf, the owner of shares of stock in the Bettendorf Company, transferred legal title of the shares to her brother but reserved the right to the income for the remainder of her life. Citing its decision in *Alfred LeBlanc v. Commissioner,*[60] the Board of Tax Appeals

---

[55] *Old Colony Trust Company v. Commissioner,* 279 U.S. 716 (1929); *Lucas v. Earl*, 281 U.S. 111 (1929); *Corliss v. Bowers,* 281 U.S. 376 (1930); *Helvering v. Horst,* 311 U.S. 112 (1940).
[56] *Blair v. Commissioner,* 300 U.S. 5 (1937); *Caruth Corporation v. U.S.*, 865 F.2d 644 (1989).
[57] *Hort v. Commissioner,* 313 U.S. 28 (1941); *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958); *Estate of Frank D. Stranahan v. Commissioner,* 472 F.2d 867 (1973).
[58] *Bettendorf v. Commissioner,* 49 F.2d 173 (8th Cir. 1931); *Heminway v. Commissioner,* 44 TC 96 (1965).
[59] Id.
[60] 7 B.T.A. 256.

concluded that the brother, as purchaser of the stock, was first the recipient of that income and therefore was taxable on it.[61]

The Court of Appeals distinguished *LeBlanc* from the instant case, noting that Catherine Bettendorf was the absolute owner of the stock and as an incident to such ownership she was entitled to all the earnings or dividends derived from them. By contract, however, she transferred the legal title to the stock, retaining by the terms of that same contract the right to the income during her life. In finding that the income was at no time that of the brother's because by the very contract under which he held the legal title, he was bound to account to the donor for the income, the Court of Appeals stated,

> We should regard the substance rather than the form. The simple fact appears to be that the petitioner was, so far as the income from these securities was concerned, a trustee, a fiduciary and not a beneficiary. The purpose of the income tax law was to tax incomes actually and substantially derived, rather than such as might be constructively received. We must assume that it was not the purpose of the act to penalize an individual because he might be the innocent agency by or through whom a substantial income as derived for someone else. The Government will not resort to sharp practice, nor invoke technical construction or fiction, which will manifestly thwart the goodfaith intention of its taxpayers, for the purpose of visiting a tax burden upon one, who in fact did not, except by construction, derive any beneficial income from the transaction. The income which petitioner received from these securities was not the income with which one pays debts.[62]

In *Heminway v. Commissioner,*[63] the petitioner, Willard Heminway, also acquired stock pursuant to a stock purchase agreement whereby the seller, Madeleine Holden, retained a life interest in the dividends. The Service contended that Heminway was the legal and beneficial owner of the dividends, and that his agreement to pay over future dividends was either an anticipatory assignment of future income or constituted part of the purchase price for the stock.

The Tax Court, citing *Bettendorf*, found that Heminway was either a fiduciary or an agent for Holden and was not taxable on the dividends on the stock because he did not derive any income therefrom. The Tax Court also noted that Holden, as the beneficial owner, paid the tax imposed on the amounts paid over by Heminway, as dividends, and not as capital gains incident to the sale of the stock.

---

[61] In *Alfred LeBlanc,* the petitioner was a stockholder and continued to own the stock. He assigned the income of the stock to his son but refused to transfer the stock. The Board held that both the stock and the earnings belonged to the petitioner.

[62] 49 F.2d 173 (8th Cir. 1931).

[63] 44 TC 96 (1965).

Thus, where the property (i.e., the "tree") is transferred but the income from the property is reserved, the income is taxed to the one who reserves it.[64] However, where the property is transferred and the income from the property is reserved to pay part of the consideration for the purchase, the income is taxable to the purchaser of the property.[65]

Although the Termination Agreement is arguably a separate agreement and should not even be considered when examining the terms of the Custody Agreement to see whether Principal Life acquired, indirectly, an interest in the dividends, an examination of its impact shows that it does not change the basic application of *Bettendorf* and *Heminway*. The Termination Agreement provides that in exchange for consideration of $100, the CSR holder promises to purchase the CDRs from the holder in the event of the liquidation of the Issuer or the failure of the Issuer to maintain its status under Rule 2a-7 under the Investment Company Act of 1940 as a money market fund or similar entity. The purchase price is set at 95% of the estimated present value of dividends foregone during the remaining restricted dividend period.

In *Bettendorf v. Commissioner*,[66] the contract of sale executed between Joseph Bettendorf and Catherine Bettendorf provided that in the event Joseph Bettendorf sold the shares generating the reserved dividends, Joseph Bettendorf was to pay at least quarterly a sum equal to the rate of interest paid by savings banks on savings deposits in the City of Davenport. The Service argued that the contract vested the petitioner with the absolute legal title to the securities, with power of disposition, and provided that if he should sell, then he was to pay a sum equal to the rate of interest paid by savings banks, indicating under certain contingencies that Joseph Bettendorf might be required to pay a sum equal to the rate of interest rather than the actual income from these securities. The Court of Appeal's brief answer was that this had no relevancy to the issue at stake because the contingency had not arisen and the Court was dealing only with actual income from the securities.

The same is true for the Termination Agreement. The agreement takes effect only in the event of two remote contingencies, neither of which is in the control of the holders of the CSRs, unlike *Bettendorf*. In the meantime, the CDR holder receives only the dividends paid on the underlying RIC shares during the restricted dividend period.[67] If the operations of the RIC are unable to support a

---

[64] See also, *Montgomery v. Commissioner*, 73 TCM 3095 (1997) [citing *Heminway* as providing that "a taxpayer does not realize income by acting as a mere conduit for the transfer of funds on behalf of another"]; *Lazarus v. Commissioner*, 58 TC 854 (1972) [trust held no corpus; transaction was a transfer of stock to the trust with a reservation of the right to have $75,000 of the annual income thereof distributed to petitioners]; *McCulley Ashlock v. Commissioner*, 18 TC 405 (1952) [by contract of sale whereby petitioner purchased real property and the seller retained possession and rents for a period of time, the seller retained legal ownership as well as control, benefits, and unfettered command of the rents].

[65] *Ellison v. Commissioner*, 80 TC 378 (1983).

[66] 49 F.2d 173 (8th Cir. 1931).

[67] Custody Agreement, Section 4.1(a); Form of CDR, page B-2.

$1 per share value, the CDR holder potentially would not receive any dividends. In this situation, the CDR holder only has recourse to the Issuer.[68] The Termination Agreement does not guarantee the amount or the timing of these dividends in any way. Therefore, apart from the occurrence of the contingent events, the Termination Agreement has no force or application and the CDR holder is at risk to the amount of dividends actually paid (or not paid) by the RIC.

In summary, in the absence of a statutory exception, case law controls the tax treatment of the CSRs. Because the fundamental substance of the transaction consists of the acquisition of RIC shares subject to a reservation of dividends for a period of time, *Bettendorf* and *Heminway* are directly on point and constitute the controlling law in this situation.

B. Ability to transfer ownership of the dividends

The agent also argues that there was a transfer of the ownership of the dividends to the CDR holder and that the transfer was ineffective stating that:

> [U]nder U.S. tax principles, the owner of a dividend is considered to be the owner of the stock on which the dividend is paid on the record date for the dividend. Therefore, the sale of a dividend or other current income stream does not constitute a sale of the security. *Consequently, without the sale of the underlying shares, the sale of the right to receive dividends does not transfer ownership of the dividends for tax purposes.* Instead the "seller" is considered to sell a contractual right to the "buyer" to receive equivalent dividend payments. Accordingly, the formation of the custodial share arrangement does not separate the ownership of the income from the ownership of the underlying shares it merely allocates a stream of payments between the two parties.[69]

The agent does not cite any authority for his position, although his argument is very similar to that of the Government's in *Estate of Frank D. Stranahan v. Commissioner*,[70] a Tax Court memorandum decision that was subsequently overturned by the U.S. Court of Appeals for the 6th Circuit. It is worth noting the facts of the case because of the striking similarities to the agent's position.

In its analysis of the transaction, the Tax Court found it significant that a shareholder has no right to share in the profits of a corporation under normal circumstances until the directors in their discretion declare a dividend as the primary basis for its conclusion. As stated by the Tax Court:

---

[68] Custody Agreement, Form of CDR, page B-2.
[69] (Form 886A 5701 FP 03, page 12) (emphasis added.)
[70] 30 TCM 1078 (1971).

> Ordinary dividends are the distributions of earnings of a corporation to its stockholders. A corporation is not authorized to distribute earnings as dividends to those not stockholders, except under the authority and at the request of those entitled to receive them as stockholders. When dividends are declared the corporation then becomes indebted to its stockholders for the amount. [Citation omitted.] If the stockholder assigns his right to receive the dividend, the corporation by paying the dividend to the assignee satisfies an obligation to the stockholder. The right to receive it from the corporation accrues by virtue of the stock ownership. It is a stockholder's right although they are paid to others whose rights are derived from the stockholder's right to receive them. The situation is analogous to a case where A owes B a debt and authorizes C to pay money owing to him to satisfy the debt. In so far as A is concerned, he receives income when his debt to B is paid.[71]

Therefore, in the Tax Court's view the "alleged" assignment did not result in any substantial change in the taxpayer's control over the shares. Because there was no effective separation of the "fruit" from the "tree," the taxpayer was taxable on the income when and as received by the assignee. This, in essence, is the agent's argument.

However, in *Estate of Frank Stranahan v. Commissioner,*[72] the Court of Appeals did not place any weight on this argument. What the Court of Appeals found weighty was the fact that a taxpayer who assigns future income for consideration in a bona fide commercial transaction will ordinarily realize ordinary income in the year of receipt. After examining the cases cited by the Tax Court in its analysis above, the Court of Appeals found it significant that in two out of the three cases cited by the Tax Court, there was *no consideration paid* in exchange for the assignment of dividends. In the third case, involving the sale of future partnership profits, the Court of Appeals found it significant that the assignment was recognized as ordinary income in the year the assignment was executed. The Court of Appeals thus disregarded who held title to the dividends (i.e., the holder of record) and looked at who received the economic benefit from such dividends. This is simply an application of the classic substance-over-form doctrine.

The Tax Court in *Heminway* also applied this substance-over-form analysis, stating that,

> Respondent's principal contention, that the right to receive dividends cannot be severed from the "bundle of rights" which comprise a share of stock, does not further our inquiry. It is true the corporation could pay dividends only to Heminway as the

[71] 30 TCM 1078 (1971).
[72] 472 F.2d 867 (6th Cir. 1973).

> shareholder of record, [citation omitted], and that Heminway did receive them; but as we have found as a fact, he received them as either an agent or a fiduciary and did not *derive* income from them. [Citation omitted.] Respondent's statement that Heminway was the only person entitled to receive the dividends and thus is taxable thereon, is a conclusion which does not follow from its premise, for no tax is imposed upon the receipt of a dividend in a fiduciary or agency capacity. Respondent's conclusion that Heminway was the beneficial owner of the shares is not supported by the facts of this case.[73]

Nor are the agent's arguments with respect to this transaction supported by the facts of the CSR transaction. The terms of the contract that grant ownership rights in the regulated investment company shares to the CSR holder also reserved ownership rights in the dividends to the CDR holder for a term of years.[74] The shares are acquired through the Custodian by the Depositor,[75] acting as agent for the principal,[76] who the IRS agent has identified in this case as the initial holder of the CDR.[77] A purchaser of the CSRs, therefore, can only acquire ownership in the underlying regulated investment company shares by agreeing to the reservation of the dividends for a term of years and does not acquire any beneficial interest in those dividends. Contrary to the agent's position, there is no transfer of dividend rights.

In summary, Principal Life acquired ownership of the shares through the same contract that reserved the ownership of the dividends through the CDR. Therefore, Principal Life did not acquire any beneficial interest in the dividends that would result in the dividends being taxable to Principal Life.[78] Principal Life is at most a fiduciary or agent for the CDR holder, who is the true owner of the dividends for tax purposes during the restricted dividend period.[79]

C. <u>The assignment-of-income doctrine applies where only the income is sold</u>

Finally, the agent argues that if Principal Life retains the income-producing property (i.e., the RIC shares) and carves income or a partial interest out of the property, the assignment-of-income doctrine applies.

---

[73] *Heminway v. Commissioner*, 44 T.C. 96, 101 (1965).
[74] Custody Agreement; CSR.
[75] Custody Agreement, Section 2.1(a).
[76] Custody Agreement, definitions.
[77] Form 886-A 5701 FP 03, Page 4.
[78] *Bettendorf v. Commissioner*, 49 F.2d 173 (8th Cir. 1931); *Heminway v. Commissioner*, 44 TC 96 (1965).
[79] See Section 2.6(c) of the Custody Agreement allowing the holder of the CSRs to terminate the custody agreement and assume directly all of the obligations of the Custodian with respect to the CDR holder.

This is recasting the transaction to fit a theory and does not comport to what was actually done. The CSR specifically provides that Principal Life is the owner of shares issued by a RIC *exclusive of the right to receive distributions* (other than in respect of a return of capital) on such shares paid on or prior to the end of the restricted dividend period. Because Principal Life contractually acquired the RIC shares *exclusive* of the right to the dividends for the restricted dividend period, Principal Life has no legal right or ability to carve such income out of the shares and transfer it to another. Therefore, the case law cited by the agent dealing with the assignment of income doctrine does not apply. The case law dealing with the second corollary to the assignment of income doctrine (e.g., *Bettendorf and Heminway*) does apply, based on a comparison of the facts of these cases with the facts of the CSR transaction.

*III. The custodial arrangement cannot be treated as a partnership.*

As his last alternative position, the agent argues that the custodial arrangement could be treated as a partnership resulting in a reallocation of income attributable to the underlying RIC shares.

1. <u>Characterization of the custodial arrangement as a constructive trust for Federal tax purposes</u>

The agent first assumes, without discussion, that the custodial arrangement constitutes a constructive trust under Treasury Regulation § 301.7701-4. Treasury Regulation § 301.7701-1(a)(1) provides that whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend upon classification under local law. Treasury Regulation § 301.7701-1(a)(2) provides that a joint venture or other contractual arrangement may create a separate entity for federal tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom. Generally, a joint undertaking merely to share expenses does not create a separate entity for federal tax purposes. Neither does the mere co-ownership of property that is maintained, kept in repair, and rented or leased.

Treasury Regulation § 301.7701-4(a) defines the term "trust" as an arrangement created either by a will or by an inter vivos declaration whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries under the ordinary rules applied in chancery or probate court. Generally, an arrangement will be treated as a trust under the Internal Revenue Code if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit.

Where the custodial functions of an arrangement are merely ministerial in nature, the arrangement does not constitute a trust, but rather a principal-agent

relationship. The basic distinction between these two is that in a trust relationship, the trustee has the responsibility and discretionary authority to protect and conserve the property on behalf of the beneficiaries who cannot share in the discharge of this responsibility.[80]

The following summary of the duties and powers of the Custodian indicates that the Custodian does not have the responsibility or authority to protect and preserve the shares on behalf of the CSR holders:

1. The Custody Agreement explicitly states that it is created as a security arrangement and paying agency.[81]
2. The Custodian does not have the authority to assign, transfer, pledge, set-off or otherwise dispose of any of the shares or dividends.[82]
3. The Custodian is prohibited from taking any action with respect to the RIC shares except at the direction of the CSR holder. The CDR holder has no ability to control the actions of the Custodian.[83]
4. The Custodian cannot vote the RIC shares in its discretion. At most, the Custodial can only abstain on any ballot where the holder of the CSRs has given no direction.[84]
5. The Custodian is not authorized to proceed against the Issuer in the event of a nonpayment or to assert the rights and privileges of holders of the CSRs and does not have any duty to do so. The Custodian is only required to take action that is necessary or appropriate to preserve the right of such holder to proceed directly and individually against the Issuer and only at the request of a CSR holder.[85]
6. The Custodian is not under any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of the shares or the CSRs.[86]
7. During the restricted dividend period, any holder of CSRs may terminate the custody agreement in respect of the shares and assume directly all of the obligations of the Custodian to the corresponding holder(s) of the CDRs.[87]

In summary, the provisions of the Custody Agreement do not create a trust relationship among the parties but rather a principal-agent relationship between the Custodian and the CSR holder that may be terminated at will by the CSR holder.

---

[80] Treasury Decision 8080, 1986-1 CB 371; *City National Bank and Trust Company v. United States*, 109 F.2d 191 (7th Cir. 1940); Treas. Reg. Sec. 301.7701-4(a).
[81] Custody Agreement, 2nd Whereas, Page 1.
[82] Custody Agreement, Section 2.1(d), Page 4.
[83] Custody Agreement, Section 2.2(c), Page 5.
[84] Custody Agreement, Section 2.5(a), Page 7.
[85] Custody Agreement, Section 5.1(c), Page 12.
[86] Custody Agreement, Section 5.1(e), Page 13.
[87] Custody Agreement, Section 2.6(c), Page 8.

B. If the custodial arrangement is deemed to be a constructive trust, it constitutes an investment trust and not a business entity

The agent argues that the arrangement creates investment interests that differ from the interests that would be obtained by direct investment in the assets. Because an investment trust with multiple classes of ownership interests will ordinarily be classified as a business entity under Treasury Regulation § 301.7701-2, the agent argues that the custodial arrangement should be classified as a business entity and a partnership by default. The agent's position is based on his conclusion that the share and dividend receipts represent two different classes of ownership interests and that the multiple classes of ownership interests permit the investors, by transferring one of the certificates and retaining the other, to fulfill varying investment objectives of seeking primarily either dividend income or capital appreciation from the stock.

Under Treasury Regulation § 301.7701-4(c), an investment trust will be classified as a trust (and not a business entity) if it meets the following two conditions:

1. There is no power under the trust agreement to vary the investment of the certificate holders, and
2. The investment trust has a single class of ownership interests, or, if multiple classes of ownership interests exist, the trust was formed to facilitate direct investment in the assets of the trust and the existence of multiple classes of ownership interests is incidental to that purpose.

In 1986, Treasury added the second requirement because of the rise of multiple class trusts, which departed from the traditional form of fixed investment trusts by providing beneficiaries with diverse interests. As stated by Treasury in T.D.8080,[88]

> The existence of varied beneficial interests may indicate that the trust is not employed simply to hold investment assets, but serves a significant additional purpose of providing investors with economic and legal interests that could not be acquired through direct investment in the trust assets. Such use of an investment trust introduces the potential for complex allocations of trust income among investors, with correspondingly difficult issues of how such income is to be allocated for tax purposes.[89]

Without conceding the fact that the custodial arrangement does not rise to the level of a constructive trust, the custodial arrangement would still qualify as an investment trust because it meets both conditions mandated by Treasury Regulation § 301.7701-4(c). The first condition is met because the Custodian

[88] 1986-1 CB 371.
[89] Id.

does not have the authority to assign, transfer, pledge, set-off or otherwise dispose of any of the shares or dividends.[90]

The second condition is also met, because the CSRs were formed to facilitate direct investment in the RIC shares and the existence of the CSRs is incidental to that purpose. This is clear by the fact that the custodial arrangement can be terminated and the CSRs can be cancelled without affecting any of the interests of the parties in the RIC shares.[91]

Example 4 of Treasury Regulation § 301.7701-4(c)(2) supports this conclusion. In Example 4, a corporation purchases a portfolio of bonds and transfers the bonds to a bank under a trust agreement in exchange for certificates evidencing interests in the bonds. Under section 1286, stripped coupons and stripped bonds are treated as separate bonds for federal income tax purposes. Example 4 concludes that the existence of multiple classes simply provided each certificate holder with a direct interest in what is treated under section 1286 as a separate bond and which could be acquired by direct investment.

Example 4 illustrates the governing principle that if an interest in an asset can be obtained directly, the use of multiple ownership interests in a trust arrangement will be viewed as merely facilitating the direct investment and will not cause the trust to be treated as a business entity. The presence of a statutory provision in Example 4 (i.e., section 1286) is incidental to the application of this principle. It is clear that under case law stock can be sold to another party with the seller reserving a term interest in the dividend income.[92] The use of a custodial arrangement to establish a security interest in the RIC shares is for convenience only and not out of necessity. The same arrangement could have been accomplished directly, without the use of the custodial arrangement.[93]
The agent alludes to the application of Example 3 in this situation by stating that the CSRs enable the holders to fulfill varying investment objectives of seeking primarily dividend income or capital appreciation from the stock. Example 3 deals with the situation where a participant, in exchange for depositing shares of stock, received two certificates that could be separated and traded independently. One certificate represented the right to dividends and the value of the underlying stock up to a specified amount; the other certificate represented the right to appreciation in the stock's value above the specified amount. Example 3 concludes that the multiple classes of ownership interests are designed to permit investors, by transferring one of the certificates and retaining the other, to fulfill their varying investment objectives of seeking primarily either dividend income or capital appreciation from the stock held by the trust. Because the trust in Example 3 serves to create investment interests with respect to the stock held by

[90] Custody Agreement, Section 2.1(d), Page 4.
[91] Custody Agreement, Section 2.6(c), Page 7.
[92] See *Bettendorf* and *Heminway*.
[93] See Section 2.6(c) of the Custody Agreement.

that trust that differs significantly from direct investment in the stock, the trust in Example 3 is not formed to facilitate direct investment in the assets of the trust and therefore is a business entity.

While Example 3 has superficial similarities to the CSRs, there are substantive differences that distinguish these two situations. The receipts were created to facilitate a security arrangement favoring the depositor, who retained the dividends on the RIC shares during the restricted dividend period. The CDRs do not impart any other rights in the RIC shares. Also, because the RIC pays out all of the earnings of the fund through dividends, there is no realistic expectation for capital appreciation on the part of either holder. The economic interest of both holders in the shares involves the receipt of dividend income: currently for the CDR holder, prospectively for the CSR holder. Finally, as mentioned above, this security arrangement could have been structured without the use of the Custody Agreement and the issuance of the CSRs.

In summary, assuming for the sake of argument that the custodial arrangement constitutes a constructive trust, the custodial arrangement would qualify as an investment trust under Treasury Regulation § 301.7701-4(c). The custodial arrangement does not provide the Custodian with any power to vary the interests of the CSR holders in the RIC shares and the Custody Agreement and CSRs do not create interests in the RIC shares that could not otherwise be created apart from the use of the custodial arrangement. The custodial arrangement is simply the vehicle of choice used to administer the security agreement entered into by the parties for the benefit of the CDR holder.

<u>SUMMARY</u>

In summary, based on an analysis of the Custody Agreement and the CSRs, the substance of the CSR transactions is a purchase of shares of common stock in a regulated investment company and a security agreement for the benefit of the CDR holder who retains the right to receive the dividends paid by the RIC during the restricted dividend period. The agent's primary position that the CSRs are collateralized non-recourse debt instruments is arbitrary and without substance.

Case law governing the acquisition of property subject to a term interest provides that the purchaser is at most a fiduciary or agent for the party retaining the term interest. Therefore, the assignment of income doctrine does not apply and Principal Life does not acquire a beneficial interest in the dividends paid by the RIC during the restricted dividend period. Nor can Principal Life be deemed to have bought the dividends.

Finally, because the custodial arrangement is only used to facilitate the security agreement and is not necessary for this purpose, the custodial arrangement should not be treated as a business entity, such as a partnership under the default classification rules for business entities.

Principal Financial Group

Principal Life Insurance Company

July 11, 2002

Ogden Submission Processing Center
P.O. Box 9941
Mail Stop 4912
Ogden, UT 84409

Re: Designation of Agent
Principal Mutual Holding Company
EIN: 42-1476365
Tax Years 1998, 1999, and 2000

Dear Sir or Madam:

In accordance with Revenue Procedure 2002-43, please accept the enclosed documentation designating Principal Life Insurance Company as the substitute agent to Principal Mutual Holding Company. Because it merged with an affiliate in 2001, Principal Mutual Holding Company is no longer in existence.

Please contact me at (515) 247-8915 if you have any questions.

Sincerely,

Carolyn Kolks

Carolyn F. Kolks

RECEIVED IN CORRES
IRS-OSC/520
JUL 21 2002
OGDEN, UTAH

Mailing Address: Des Moines, Iowa USA 50392-0001 (515) 247-5111

## REV. PROC. 2002-43: DESIGNATION BY GROUP MEMBERS UNDER 1.1502-77A(d)

In accordance with section 8.03 of Revenue Procedure 2002-43, the following information is provided.

**Section 8.03(2) Name, address and EIN of the terminated common parent.**

Principal Mutual Holding Company
711 High Street
Des Moines, IA 50392
EIN: 42-1476365

**Section 8.03(3) Name, address and EIN of the designated substitute agent and consolidated return years.**

Principal Life Insurance Company
711 High Street
Des Moines, IA 50392
EIN: 42-0127290

Consolidated return years: 1998, 1999, and 2000

**Section 8.03(4) Name and EIN of common parent under which the returns for 1998, 1999, and 2000 were filed.**

The returns for tax years 1998, 1999, and 2000 were filed under the party designated above in Section 8.03(2).

**Section 8.03(5) Internal Revenue Service Center where the consolidated returns were filed.**

The returns for the tax years 1998 and 1999 were filed at the Kansas City Service Center. The return for the tax year 2000 was filed at the Ogden Service Center.

**Section 8.03(6) Date common parent terminated.**

Principal Mutual Holding Company terminated on October 26, 2001.

**Section 8.03(7) Name and address of corporation that has custody of the books and records with respect to tax years 1998, 1999, and 2000.**

Principal Life Insurance Company, as designated above, has custody of the books and records.

RECEIVED IN CORRES
IRS - OSC / 520
JUL 21 2002
OGDEN, UTA

Principal Financial Group

**REV. PROC. 2002-43: DESIGNATION BY GROUP MEMBERS UNDER 1.1502-77A(d)**
**Tax Year 1998**

**Section 8.04 Declaration**

For each of the companies referenced below, as a duly authorized officer, I declare under penalties of perjury, that I am (or was) authorized to make this designation on behalf of the named member of the group and that, to the best of my knowledge, the information provided is true, correct, and complete.

Joyce N. Hoffman [signature] Joyce N. Hoffman

7/15/02
Date

Companies

Principal Financial Group, Inc.
Principal Financial Services, Inc.
Principal Life Insurance Co.
Principal Holding Company
Petula Associates, Ltd.
Patrician Associates, Inc.
Principal Development Associates, Inc.
Princor Financial Services Corporation
Principal Management Corporation
Principal Investors Corporation
Invista Capital Management, Inc.
The Principal Financial Group, Inc.
Principal Marketing Services, Inc.
Principal Health Care, Inc.
Principal Health Care of Kansas City, Inc.
Principal Health Care of Nebraska, Inc.
Equity FC, Ltd.
Principal Financial Advisors, Inc.
Delaware Charter Guarantee & Trust Company
Principal Securities Holding Corporation
Principal Health Care of Iowa, Inc.
Principal Asset Markets, Inc.
Principal Health Care of Louisiana, Inc.
Principal Health Care of Delaware, Inc.
Principal Financial Securities, Inc.
Principal Health Care of Florida, Inc.
Principal Portfolio Services, Inc.
Principal International, Inc.
Principal Spectrum Associates, Inc.
Principal Wholesale Mortgage, Inc.
Principal Health Care of Illinois, Inc.
Principal FC, Ltd.
Principal Commercial Advisors, Inc.
Principal Residential Mortgage, Inc.
Principal Health Care of Indiana, Inc.
Principal Health Care of Pennsylvania, Inc.
Principal Health Care of the Carolinas, Inc.
United Health Care Services of Iowa, Inc.
Principal Health Care of Tennessee, Inc.
Principal Health Care of Georgia, Inc.
Principal Health Care Management Corp.
Principal Health Care of South Carolina, Inc.
Principal Health Care of Texas, Inc.
Principal Health Care of St. Louis, Inc.
The Admar Group, Inc.
Admar Corporation
Selectcare Management, Inc.
Image Financial & Insurance Services, Inc.
Admar Insurance Marketing, Inc.
Benefit Plan Administrators, Inc.
Wm. G. Hofgard & Co., Inc.
Trust Consultants, Inc.
Magnus Properties, Inc.
Health Risk Resource Group, Inc
Dental Net, Inc.
Employer's Dental Services, Inc.
Principal JMC, Inc.

RECEIVED IN CORRES
IRS - OSC / 520
JUL 21 2002
OGDEN, UTAH

Principal Financial Group