The Service cites *Nicole Rose Corp v. Commissioner*, 320 F.3d 282 (2d Cir 2003), for the proposition that sophisticated taxpayers cannot rely on experts to avoid the imposition of an accuracy-related penalty. However, in that case, the court held that there was no business purpose or economic substance to the transaction.

In contrast, as discussed in the TAM submissions, the Taxpayer had a well-documented business purpose. The investment also had economic substance because each party bore the risks and benefits of the transaction that could result in a meaningful change in Taxpayer's economic position. The Taxpayer engaged in the transaction as part of its credit exposure analysis as well as its asset-liability matching program.

*a. Maintenance of records*

Finally, the Taxpayer maintains adequate books and records to substantiate items. In *Westby v. Commissioner*,[8] the Service asserted negligence penalties for failure to keep adequate records despite requesting and receiving records on several different occasions. The Service argued the records were inadequate because the taxpayer did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. The court found that the taxpayer had maintained voluminous records, as demonstrated at trial.

Here, The Taxpayer maintains an extensive accounting system, including a general ledger. Maintaining these books is another indicia that the Taxpayer has not acted negligently.

*2. Reasonable basis defense to negligence*

In accordance with Treasury Regulation section 1.6662-3(b), a return position that has a reasonable basis is not attributable to negligence. This standard is a relatively low standard. It is significantly higher than frivolous or patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[9] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[10] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[11] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[12]

[9] Treas. Reg. section 1.6662-4(b)(3).
[10] Treas. Reg. section 1.6662-4(d)(3)(iii).
[11] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[12] Treas. Reg. section 1.6662-4(d)(3)(ii).

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulations, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied.

Here, the Service acknowledged the lack of direct authority regarding these transactions. The examining agent requested technical advice from the National Office in February 2004, stating: "The field is unaware of any authority directly applicable to the transactions in question."

The examining agent and counsel for the Service expressed the opinion that sections 1286, 305(e) and 61, and the regulations thereunder, may control. The examining agent relied primarily on authorities relating to an allocation of basis between the principal-only certificates and the interest-only certificates. The National Office did not rely on those authorities, however, in its ruling dated August 20, 2004. Instead, it ruled that the trust did not meet the requirements for an investment trust, resulting in the creation of a tax partnership upon the sale of the principal-only certificates by Principal Life. The striking difference in the analysis supports the position of the Taxpayer that the law applicable to the transactions in question is not clear. In addition, the Taxpayer considered each of the issues raised by the examining agent in the request for technical advice, and the issues raised by the National Office in its ruling, prior to filing the tax returns for the years 2000 and 2001.

Considering the Service acknowledged that the law was unclear, it is difficult to understand the argument that the Taxpayer's position was without a reasonable basis. To the contrary, the Service's acknowledgement implies that the Taxpayer's position was reasonable; a negligence penalty should not apply to the investment transactions.

*3. Disclosure defense to disregard of the rules or regulations*

Treasury Regulation section 1.6662-3(c)(1) provides that the penalty for negligence or disregard of the rules cannot be imposed on an understatement that is attributable to a position contrary to a rule or regulation if the position is disclosed in accordance with the regulations. The penalty for disregarding rules and regulations is not imposed on any portion of an underpayment that is attributable to a position contrary to a rule or regulation if the position is adequately disclosed pursuant to the requirements of Treasury Regulation section 1.6662-3(c)(2). Disclosure is adequate under section 1.6662-3(c)(2) if a properly completed Form 8275 is filed.[13]

Because the Taxpayer concluded that its position was not contrary to the rules or regulations, it did not file Form 8275. The Taxpayer, did however, file a disclosure in accordance with the reportable transaction regulations then in place.[14] The Taxpayer recognized that the Code, Treasury regulations, cases and rulings did not directly address

---

[13] A taxpayer cannot rely on the annual revenue procedure for purposes of negligence portion of the negligence or disregard of the rules or regulations penalty.
[14] Treas. Reg. section 1.6011-4.

the tax consequences of these transactions. Accordingly, the Taxpayer disclosed them on the tax returns filed in 2000 and 2001, as the Service noted in its explanation. Upon audit of these returns, the Taxpayer cooperated with the Service and provided all of the relevant documents in their possession, other than documents protected from disclosure by the attorney-client privilege or attorney work-product doctrine.

The Service issued Announcement 2002-2 in late 2001. The Announcement described a disclosure initiative to encourage taxpayers to disclose their treatment of tax shelters and other items for which the imposition of the accuracy-related penalty may be appropriate if there is an underpayment of tax. The Announcement contained certain conditions that Taxpayers must meet in order to qualify for waiver of the penalty under section 6662(b) of the Code. The Taxpayer had filed its tax return for the year 2000 in March 2001; it filed a superceding return in September 2001. It disclosed the transactions in question on both returns and substantially complied with the conditions set forth in Announcement 2002-2.

The Taxpayer disclosed the transactions in its tax returns for the year 2001 filed in March 2002 and September 2002. Again, it substantially complied with the conditions set forth in the Announcement. These facts are relevant for several reasons. First, a taxpayer that substantially complied with the disclosure requirements in this notice should not be held to a higher standard in meeting the requirements for disclosure in sections 6662 and 6664. Second, a taxpayer that did not engage in listed transactions should not be treated worse than taxpayers that engaged in listed transactions but qualified for amnesty under this Announcement.

The Taxpayer's affiliated group has been under continuous exam by the Service for many years. The Taxpayer has routinely disclosed errors and items for which the tax consequences are unclear to the Service, either by a statement or form attached to the tax return or by a statement provided upon commencement of the audit in accordance with Revenue Procedure 94-69.

These actions clearly show that the Taxpayer makes every effort to comply with the law. It is inherently unfair to allow mere technicalities to apply such that the Taxpayer is liable for a penalty when the Taxpayer has alerted the Service to a position taken on the return.

*4. Reasonable cause and good faith defense*

Section 6664(c)(1) provides that no penalty may be imposed upon a showing that there was reasonable cause and taxpayer acted in good faith. "Reasonable cause and good faith" is determined on a case-by-case basis, taking into account all the pertinent facts and circumstances. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability.

Upon audit of Taxpayer's returns, the examining agent requested technical advice from the National Office. The examining agent would have no need for technical advice if the law were clear. The lack of clarity in the law is also reflected by statements contained in

Notice 2003-55, which deals with lease-stripping transactions. After noting that the Service may impose penalties on taxpayers engaged in lease-stripping transactions, the Service stated:

> In addition, the Service is currently evaluating other situations in which tax benefits are claimed as a result of transactions in which the ownership of property has been separated from the right to income from the property. For example, the Service is evaluating situations in which, in exchange for consideration, one participant assigns its interest in property but retains the right to income from the property, and, by allocating all of its basis to the transferred property and none to the retained future payments, the transferor claims a loss on the transfer.

The paragraph implies that the National Office had not yet established a position regarding the tax consequences of such transactions, such as the transactions in which Principal Life engaged. If the Service had not yet established a position when it issued the Notice, it is difficult for the Service to assert that the Taxpayer did not have reasonable cause for their position.

Furthermore, in a call with Randy Bergstrom, tax counsel for the Taxpayer, on May 1, 2003, the examining agent expressed the view that he did not think penalties would apply "as the transactions were disclosed and there is some basis for the position taken by the taxpayer." Although a Field Service Advice[15] dated August 2, 2001, was issued prior to the date the Taxpayer filed the superceding return for the year 2000 and the return for 2001, a Field Service Advice issued in connection with an unrelated taxpayer is not an authority that should be taken into account in determining whether the Taxpayer had reasonable cause or acted in good faith in this case. In addition, the Advice notes that further factual development was needed before the Service could determine the applicable tax consequences. Accordingly, that Advice should be ignored. The statutes, regulations, cases and rulings on which the Taxpayer relied are set forth in the statements that the Taxpayer submitted to the National Office in connection with the request for technical advice and which are attached.

A taxpayer's reliance on an opinion may indicate reasonable reliance in good faith. In determining whether a taxpayer has relied in good faith on advice, all the facts and circumstances must be taken into account. Reliance may not be in good faith if the taxpayer knew or should have known that the advisor lacked knowledge of relevant aspects of tax law. Factors used to determine if the taxpayer acted in good faith include the following:

1. The advice must be based on all pertinent facts and circumstances, including the purpose of the transaction or structure of the transaction.

---

[15] Generally, for purposes of section 6662, the regulations provide which types of authority may be relied upon to determine whether the standards imposed by section 6662 and the regulations thereunder are met. Field Service Advice is not one of the listed items. For "other administrative pronouncements," such pronouncements must be published by the Service in the Internal Revenue Bulletin. Field Service Advice is not published in the Internal Revenue Bulletin.

2. The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person.[16]

As stated above, the Taxpayer relied on both an extensive internal review and analysis of the various factors and an opinion from external counsel who were apprised of the facts. Furthermore, the legal advice was not issued based upon unreasonable factual or legal assumptions. Likewise, the opinion did not rely on unreasonable representations, statements, findings, or agreements of the taxpayer and any other person. Other than performing extensive internal analysis and requesting external legal advice, the Taxpayer questions what else it could have done to act with reasonable cause and good faith.

*5. Tax shelter items*

Pursuant to Treasury Regulation section 1.6662-4(g)(2)(iv), a corporate taxpayer determines whether the reasonable cause and good faith exception to the substantial understatement penalty applies is determined in accordance with Treasury Regulation section 1.6664-4(e). The determination is based on all pertinent facts and circumstances. A corporation's legal justification may be taken into account in establishing that a corporation acted with reasonable cause and in good faith if certain minimum requirements are met. A failure to satisfy the minimum requirements precludes a finding of reasonable cause and good faith.

The minimum requirements are that there must be substantial authority for the tax treatment of the item and the corporation must have reasonably believed at the time the return was filed that the tax treatment was more likely than not the proper treatment. A corporation is considered to have reasonably believed the tax treatment was more likely than not the proper treatment if:

1. the corporation analyzes the pertinent facts and authorities and reasonably concludes in good faith that there is a greater than 50% likelihood that the treatment will be upheld if challenged, or
2. the corporation reasonably relies in good faith on the opinion of a professional tax advisor if the opinion is based on the advisor's analysis of the pertinent facts and authorities and unambiguously states that the tax advisor concludes that there is a greater than 50% chance the item will be upheld if challenged.[17]

Here, assuming arguendo that the investment transaction is a tax shelter, the Taxpayer and its outside counsel analyzed the facts and authorities and concluded that there is a greater than 50 percent the taxpayer will prevail.

Nor can it be contended, either for purposes of the negligence penalty under section 6662(c) or the substantial understatement penalty under section 6662(d), that a significant purpose of the overall plan or entity was avoidance or evasion of federal income taxes

[16] Treas. Reg. section 1.6664-2(c).
[17] Treas. Reg. section 1.6664-4(e)(2).

within the meaning of section 6662(d)(2)(C)(ii) or Treasury Regulation section 1.6662-4(g)(2). Taxpayer's core business is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products it sells. It is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns.

Consistent with this core aspect of its business operations, Taxpayer entered into this transaction to earn an enhanced yield and cash flow that compared favorably with other intermediate-term risk-adjusted investments. The enhanced yield was commensurate with the greater risks arising from moving down the capital structure of highly-rated and highly-regulated banks with a premium being received for the more illiquid perpetual note structure. Taxpayer viewed its investment as being an alternative to mortgage loans which were also intermediate-term investments. This investment enabled Taxpayer to move away from mortgage loans yet provide higher yields than public corporate bonds. This combined with the negative duration aspect of the investment provided positive balancing factors to Taxpayer's Asset/Liability Matching requirements. Taxpayer's purpose, therefore, was to realize the economic objective of earning a higher investment yield on intermediate-term investments.

The significance of the income separation and creation of an income-only portion from an otherwise perpetual security, therefore, was not that it avoided federal income tax, but that it increased the Taxpayer's investment options, gave Taxpayer a needed intermediate-term investment and at a yield higher than other publicly traded corporate bonds.

Moreover, availing oneself of the tax benefits provided by the Internal Revenue Code and underlying core concepts of taxation in a manner not inconsistent with the statute, Congressional purpose, or case law does not constitute a tax avoidance purpose.[18]

*6. Realistic possibility of being sustained on its merits defense*

Pursuant to Treasury Regulation 1.6694-(2)(b), a position is considered to have a realistic possibility of being sustained on the merits if a reasonable and well-informed analysis by a person knowledgeable in tax law would lead such a person to conclude that the position has approximately a one in three, or greater, chance of being sustained on its merits. The standards used to make this determination are the standards used to determine whether substantial authority exists for purposes of the substantial underpayment penalty.[19]

The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[20] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to

[18] Treas. Reg. §1.6662-4(g)(2)(ii).
[19] Treas. Reg. section 1.6694-2(b)(1), (2).
[20] Treas. Reg. section 1.6662-4(d)(3)(iii).

which the taxpayer has a right of appeal.[21] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[22]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the realistic possibility standard is generally satisfied. Although there may be different interpretations of guidance, a well-reasoned construction of the applicable provisions also establishes a realistic possibility standard for the position taken.

The Service asserts that the Taxpayer inappropriately applied Treasury Regulation section 301.7701-4(c)(2). The Taxpayer disagrees. The application of Example 4 to the investment transaction is, by analogy, a well-reasoned construction of applicable provisions. This discussion was provided to the Service in its TAM submission. Because the Taxpayer has met the requirements for having a reasonable basis for its position, has shown that the Taxpayer has reasonable cause and acted in good faith, and has substantial authority for its position, the Taxpayer has shown it has a realistic possibility of being sustained on the merits.

**Law**

**B. Substantial understatement penalty**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(2) provides a substantial understatement of income tax results in the 20 percent penalty. A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Section 6662(d)(2)(B) allows a reduction of the amount understated for items (i) for which there is or was substantial authority for such treatment or (ii) that are adequately disclosed and for which a reasonable basis for the tax treatment exists. This reduction is not allowed, however, to any item of a corporation that is attributable to a tax shelter. A tax shelter is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose is the avoidance or evasion of Federal income tax.[23]

The penalty for a substantial understatement applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried that is attributable to a "tainted item" for the year in which the carryback of the loss, deduction, or credit arises. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Tainted items are those for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit

---

[21] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[22] Treas. Reg. section 1.6662-4(d)(3)(ii).
[23] IRC section 6662(2)(C).

year.[24] In the case of a tax shelter item, a tainted item is any item for which there is not both substantial authority and a reasonable belief that the tax treatment is more likely than not the proper treatment.[25]

## Analysis

### *1. Substantial authority defense*

The "substantial authority" standard is an objective standard. This standard is less stringent than "more likely than not" (i.e., greater than 50 percent chance of succeeding in litigation) but stricter than the "reasonable basis" standard.[26] To determine whether substantial authority exists, the authorities must be examined. The weight of the authorities supporting the treatment must be substantial in relation to the authorities supporting a contrary position. Substantial authority is measured at the time the return is filed or on the last day of the taxable year to which the return relates.[27]

Among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[28] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[29] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[30]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. The Taxpayer had substantial authority for their position. The authorities on which the Taxpayers relied are set forth in the statements provided to the National Office (attached) in connection with the request for technical advice.

### *2. Adequate disclosure and reasonable basis defense*

#### *a. Adequate disclosure*

Pursuant to Treasury Regulation subsections 1.6662-4(e) and (f), disclosure is adequate if made on Form 8275 or Form 8275-R or in accordance with an annual revenue procedure. Revenue Procedure 2001-52[31] applies to tax returns filed on the 2001 tax form and

---

[24] Treas. Reg. section 1.6662-4(c).
[25] Treas. Reg. section 1.6662-4(c)(3).
[26] Treas. Reg. section 1.6662-4(d)(2).
[27] Treas. Reg. section 1.6662-4(d)(3)(iv)(C).
[28] Treas. Reg. section 1.6662-4(d)(3)(iii).
[29] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[30] Treas. Reg. section 1.6662-4(d)(3)(ii).
[31] Revenue Procedures 99-41, I.R.B. 1999-46 and 2001-11, 2001-1 C.B. 275 apply to tax years 1999 and 2000, respectively.

addresses M-1 items. Additional disclosure of facts relevant to, or positions taken with respect to M-1 items is unnecessary provided that

1. the amount of the deviation from the financial books and records is not the result of a computation that includes the netting of items, and
2. the information provided reasonably may be expected to apprise the Service of the nature of the potential controversy concerning the tax treatment of the item.[32]

Additionally, forms and attachments must be completed in a clear manner and in accordance with their instructions. Amounts entered on forms must be verifiable.

As stated above, the Taxpayer did not file Form 8275 or 8275-R because it did not conclude that the investment transaction was contrary to any rule or regulation. Because the M-1 adjustment relating to the investment transaction is a result of netting, the disclosure rules of the annual revenue procedure cannot be relied upon.

However, in accordance with the reportable transaction regulations, the investment transaction was disclosed. Because the Taxpayer disclosed the transaction in accordance with the regulations that required disclosure, it is unclear why that disclosure should not be considered appropriate disclosure for purposes of the accuracy related penalty. Clearly, the Taxpayer did not fail to disclose which is the basis for penalty relief under Treasury Regulation section 1.6662-3(c). Because the transaction was disclosed, it is unfair to disallow penalty relief that is based on disclosure by the taxpayer.

*b. Reasonable basis*

In accordance with Treasury Regulation section 1.6662-4(e)(2), disclosure is only effective in relation to the understatement penalty where there is also a reasonable basis, as defined in Treasury Regulation section 1.6662-3(b)(3). In accordance with Treasury Regulation section 1.6662-3(b)(3), this standard is a relatively low standard. It is significantly higher than not frivolous or not patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[33] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[34] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[35] Substantial authority can also exist for a

[32] Section 4.01 of (3) Rev. Proc. 2001-52, I.R.B. 2001-46
[33] Treas. Reg. section 1.6662-4(b)(3).
[34] Treas. Reg. section 1.6662-4(d)(3)(iii).
[35] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).

position that is supported only by a well-reasoned construction of the applicable provision.[36]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied, and the understatement penalty should not apply. The Taxpayers adequately disclosed the item's tax treatment in the tax returns filed for the years in question, and there was a reasonable basis for the tax treatment of this item by the Taxpayers.

3. *Understatement Insufficient to Warrant Penalty*

As provided in section 6662(d)(1)(B), for there to be a substantial understatement of tax, the amount by which the tax is understated must exceed the lesser of (i) 10% of the tax required to be shown on the return, or (ii) $10,000. After reduction of the understatement for any taxable year by the portion attributable to an item for which there was substantial authority and for any item that was adequately disclosed and for which there was a reasonable basis, the remaining portion of such understatement does not exceed the lesser of 10% of the tax or $10,000. Therefore, such remaining portion is not "substantial" within the meaning of section 6662(d)(1)(B) and imposition of the accuracy-related penalty of section 6662(a) by virtue of section 6661(b)(2) is not justified.

In conclusion, all of the facts and circumstances demonstrate that the Taxpayers have met the requirements for a complete reduction of the amount of any claimed understatement attributable to the investment transaction. For the reasons stated above, no penalty should be assessed against the Taxpayers.

---

[36] Treas. Reg. section 1.6662-4(d)(3)(ii).

PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 2000

**Penalty Abatement on Previously Taxed Income**

Taxpayer claims a refund based on removal of an accuracy related penalty. On audit, the examining agent assessed an accuracy penalty on this transaction. For the reasons set forth below, the application of a penalty to this transaction is inappropriate, and the penalty should be denied.

**Facts**

Taxpayer and Charlton (Delaware), Inc. ("Charlton"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whistling Pines on September 7, 2001. Taxpayer contributed $370 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whistling Pines. Charlton contributed 100 percent of the stock of DB Warren Investments Limited ("Warren") and DB Rivington Investments Limited ("Rivington," and together with Warren, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whistling Pines. The total value of the stock of the Cayman Entities was $51,373,130.20. Taxpayer's investment in Whistling Pines was one of several investment transactions entered into by Taxpayer in 2001 in the ordinary course of its business.

As set forth in the Whistling Pines Operating Agreement (the "Operating Agreement"), the purpose of Whistling Pines was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whistling Pines was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whistling Pines invested $370 million in the class A common stock of Cedar Investment Co., a Delaware corporation ("Cedar"). Cedar in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that Charlton contributed the stock of the Cayman Entities to Whistling Pines, each of the Cayman Entities had earnings and profits that consisted in whole or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI").
The Operating Agreement provided, in relevant part, that the profits of Whistling Pines would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 3.701 percent.

Whistling Pines did not receive any distributions of PTI from the Cayman Entities during 2001 and had no other items of income and deduction during 2001. Thus, Whistling Pines had no profits and no income (taxable or otherwise) in 2001 and, therefore,

Taxpayer had no income from its investment in Whistling Pines for 2001. Accordingly, Taxpayer properly reported no income or loss from its interest in Whistling Pines on its 2001 tax return.

Taxpayer and World Trading (Delaware), Inc. ("World Trading"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whispering Woods on November 18, 1999. Taxpayer contributed $500 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whispering Woods. World Trading contributed 100 percent of the stock of Bleeker Investments Limited ("Bleeker"), Broome Investments Limited ("Broome"), MacDougal Investments Limited ("MacDougal"), and Varick Investments Limited ("Varick," and together with Bleeker, Broome and MacDougal, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whispering Woods. The total value of the stock of the Cayman Entities was $82,724,075.96. Taxpayer's investment in Whispering Woods was one of several investment transactions entered into by Taxpayer in 1999 in the ordinary course of its business.

As set forth in the Whispering Woods Operating Agreement (the "Operating Agreement"), the purpose of Whispering Woods was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whispering Woods was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whispering Woods invested $500 million in the class A common stock of Bluewater Creek Management Co., a Delaware corporation ("Bluewater Creek"). Bluewater Creek in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that World Trading contributed the stock of the Cayman Entities to Whispering Woods, each of the Cayman Entities had earnings and profits that consisted in whole or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI"). During the period that Taxpayer was the Class A Member of Whispering Woods, the profits of Whispering Woods consisted entirely of distributions from the Cayman Entities of PTI that was exempt from taxation under section 959(a). Upon receiving distributions of PTI from the Cayman Entities, Whispering Woods reduced its bases in the stock of the Cayman Entities in accordance with section 961(b).

The Operating Agreement provided, in relevant part, that the profits of Whispering Woods would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 4.70936 percent. Because Whispering Woods' profits consisted entirely of distributions from the Cayman Entities of PTI that was exempt from taxation under section 959(a), Taxpayer's distributive share of Whispering Woods' profits consisted entirely of PTI that was exempt from taxation under section 959(a).

The Operating Agreement also provided that the section 705(a)(2)(B) expenditures of Whispering Woods would be allocated 99% to the Managing Member and 1% to the Class A Member. The reduction by Whispering Woods of its basis in the stock of the Cayman Entities was a section 705(a)(2)(B) expenditure. This expenditure was thus allocated 99% to World Trading and 1% to Taxpayer in accordance with the Operating Agreement.

On November 19, 2001, Taxpayer sold its interest in Whispering Woods to BT Overseas Finance (Delaware), Inc., an affiliate of Deutsche Bank, for $499,949,895.69. This amount was equal to the balance in Taxpayer's capital account on that date plus Taxpayer's allocable share of the gain that would have been realized by Whispering Woods if its assets had been sold for their then-fair market value.

**Law**

**A. Negligence or disregard of the rules or regulations**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Under section 6662(b)(1), if any portion of an underpayment is attributable to negligence or disregard of rules and regulations, the 20 percent penalty will be applied. Section 6662(c) defines negligence as any failure to make a reasonable attempt to comply with the provisions of the Title 26. Disregard includes careless, reckless, or intentional disregard. Pursuant to Treasury Regulation section 1.6662-(d), the penalty for negligence or disregard of the rules or regulations applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried, which portion is attributable to negligence or disregard of the rules or regulations in the year in which the carryback or carryover of the loss, deduction, or credit arises ("the loss or credit year").

The penalty for disregarding rules or regulations does not apply if the requirements to Treasury Regulation sections 1.6662-3(c)(1) and 1.6662-3(c)(2) are met.[37] Additionally, the penalty does not apply if the "reasonable cause and a good faith exception" as defined in section 1.6664-4. If the position is contrary to a revenue ruling or notice issued by the Internal Revenue Service, the penalty is not imposed if there is a realistic possibility of being sustained on its merits.

*1. Negligence*

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a return. Negligence also includes any failure by the taxpayer to keep adequate books and records to substantiate items. Negligence is strongly indicated where the taxpayer fails to make a reasonable attempt to ascertain the correctness of a

[37] Note that if negligence is asserted, a reasonable basis and disclosure do not preclude the imposition of the penalty.

deduction, credit or exclusion which would seem to a reasonable and prudent person "too good to be true" under the circumstances.[38]

*2. Disregard*

Disregard of the rules and regulations includes any careless, reckless or intentional disregard of the rules or regulations. Rules and regulations include the provisions of the Internal Revenue Code, temporary or final regulations, and revenue rulings and notices issued by the Internal Revenue Service. A disregard of the rules and regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.[39]

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances that demonstrate a substantial deviation form the standard of conduct that a reasonable person would observe. A disregard is intentional if the taxpayer knows of the rule or regulation that is disregarded. A taxpayer who takes a position contrary to a revenue ruling or notice has not disregarded the ruling or notice is the contrary position has a realistic probability of being sustained on its merits.[40]

**Analysis**

*1. Negligence*

In applying the accuracy penalty, the Service implied that the Taxpayer had been negligent because Taxpayer "should have known" that the deal was "too good to be true." Case law interpreting negligence concentrates, among other things, on whether the party in question the party sought legal and whether the taxpayer and/or the taxpayer's advisors had any experience in making similar investments. *Charfoos v. Commissioner of Internal Revenue,* T.C. Memo 1991-292; *Reali v. Commissioner,* T.C. Memo 1984-427; *Kozlowskiv. Commissioner,* T.C. Memo 1993-430.

In entering this transaction, the Taxpayer carefully and thoroughly considered all legal, economic, business and tax factors involved in this investment. The Taxpayer assembled a team of employees with considerable experience in investment transactions to review the business, legal and tax risks of the proposed transaction before engaging in it. The team provided its analysis to Taxpayer's Investment Committee before engaging in the transaction and the transaction was approved by the Investment Committee. Because the Taxpayer concluded the law was quite clear, it did not request a formal tax opinion from outside counsel.

The Service cites *Nicole Rose Corp v. Commissioner*, 320 F.3d 282 (2d Cir 2003) for the proposition that sophisticated taxpayers cannot rely on experts to avoid the imposition of

[38] Treas. Reg. section 1.6662-(b)(1)(ii).
[39] Treas. Reg. section 1.6662-(b)(2).
[40] Treas. Reg. section 1.6662-4(b)(2).
[42] T.C. Memo 2004-179.

an accuracy related penalty. However, in that case, the court held that there was no business purpose or economic substance to the transaction.

In contrast, the Taxpayer's business purpose was to routinely make investments to support its insurance business. The investment also had economic substance because each party bore the risks and benefits of the transaction that could result in a meaningful change in Taxpayer's economic position.

*a. Maintenance of records*

Additionally, the Taxpayer has maintained adequate books and records to substantiate items. In *Westby v. Commissioner*,[42] the Service asserted negligence penalties for failure to keep adequate records despite requesting and receiving records on several different occasions. The Service argued the records were inadequate because the taxpayer did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. The court found that the taxpayer had maintained voluminous records, as demonstrated at trial.

Here, the Taxpayer maintains an extensive accounting system, including a general ledger. Maintaining these books is another indicia that the Taxpayer has not acted negligently.

*2. Reasonable basis defense*

In accordance with Treasury Regulation section 1.6662-3(b), a return position that has a reasonable basis is not attributable to negligence. This standard is a relatively high standard. It is significantly higher than not frivolous or not patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[43] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[44] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[45] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[46]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, congressional intent, and guidance issued by the Service. The Taxpayer also relied upon an experienced team of employees. As a result of this thorough internal analysis, Taxpayer concluded that the law was quite clear.

---

[43] Treas. Reg. section 1.6662-4(b)(3).
[44] Treas. Reg. section 1.6662-4(d)(3)(iii).
[45] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[46] Treas. Reg. section 1.6662-4(d)(3)(ii).

As stated in the regulations, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied. Here, the standard is met because the return position was based on a reasoned analysis of the law, which indicated that the return position was correct.

*3. Disclosure defense to disregard of the rules or regulations*

Treasury Regulation section 1.6662-3(c)(1) provides that the penalty for negligence or disregard of the rules cannot be imposed on an understatement that is attributable to a position contrary to a rule or regulation if the position is disclosed in accordance with the regulations. The penalty for disregarding rules and regulations is not imposed on any portion of an underpayment that is attributable to a position contrary to a rule or regulation if the position is adequately disclosed pursuant to the requirements of Treasury Regulation section 1.6662-3(c)(2). Disclosure is adequate under section 1.6662-3(c)(2) if a properly completed Form 8275 is filed.[47]

Taxpayer concluded that the law was clear and did not file Form 8275. On its 2000 and 2001 returns, the Taxpayer prominently stated that it had received "Previously Taxed Income." This statement was a separate line item on Line 7 of Schedule M-1.[48] Upon audit of these returns, the Taxpayer cooperated with the Service and provided all of the relevant documents in their possession, other than documents protected from disclosure by the attorney-client privilege or attorney work-product doctrine. Because the Taxpayer did not attempt to bury the adjustment and because the Taxpayer complied with the Service's document request supporting this adjustment, it is unfair to assert a penalty merely because the Taxpayer did not attach a particular form to its return.

*4. Reasonable cause and good faith defense*

Section 6664(c)(1) provides that no penalty may be imposed upon a showing that there was reasonable cause and taxpayer acted in good faith. "Reasonable cause and good faith" is determined on a case-by-case basis, taking into account all the pertinent facts and circumstances. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability.

A taxpayer's reliance on an opinion may indicate reasonable reliance in good faith. In determining whether a taxpayer has relied in good faith on advice, all the facts and circumstances must be taken into account. Reliance may not be in good faith if the taxpayer knew or should have known that the advisor lacked knowledge of relevant aspects of tax law. Factors used to determine if the taxpayer acted in good faith include the following:

1. The advice must be based on all pertinent facts and circumstances, including the purpose of the transaction or structure of the transaction.

---

[47] A taxpayer cannot rely on the annual revenue procedure for purposes of negligence portion of the negligence or disregard of the rules or regulations penalty.
[48] In 1999, this item was reported in another line item noted as Income from JVs.

2. The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person.[49]

In this case, the Taxpayer relied on its team of experienced employees who reviewed the Code, regulations, case law, and Internal Revenue Service guidance. The internal review was not based upon unreasonable factual or legal assumptions or on unreasonable representations, statements, findings, or agreements of the taxpayer and any other person. Because the Taxpayer thought the law regarding the transaction was quite clear, it did not seek a formal, written opinion. On its face, the regulation does not require a written opinion. After a careful and thorough analysis of all the business and tax factors, Taxpayer concluded that the transaction met not only its investment strategy but complied with the law. Accordingly, the Taxpayer had reasonable cause to and acted in good faith in entering the transaction.

*5. Tax shelter items*

Pursuant to Treasury Regulation section 1.6662-4(g)(2)(iv), a corporate taxpayer determines whether the reasonable cause and good faith exception to the substantial understatement penalty applies in accordance with Treasury Regulation section 1.6664-4(e). The determination is based on all pertinent facts and circumstances. A corporation's legal justification may be taken into account in establishing that a corporation acted with reasonable cause and in good faith if certain minimum requirements are met. A failure to satisfy the minimum requirements precludes a finding of reasonable cause and good faith.

The minimum requirements are that there must be substantial authority for the tax treatment of the item and the corporation must have reasonably believed at the time the return was filed that the tax treatment was more likely than not the proper treatment. A corporation is considered to have reasonably believed the tax treatment was more likely than not the proper treatment if:

1. the corporation analyzes the pertinent facts and authorities and reasonably concludes in good faith that there is a greater than 50% likelihood that the treatment will be upheld if challenged, or

2. the corporation reasonably relies in good faith on the opinion of a professional tax advisor if the opinion is based on the advisor's analysis of the pertinent facts and authorities and unambiguously states that the tax advisor concludes that there is a greater than 50% chance the item will be upheld if challenged.[50]

Here, assuming arguendo that the transaction was a tax shelter, it was concluded that there is a greater than 50 percent the taxpayer will prevail. While it is true that the

[49] Treas. Reg. section 1.6664-2(c).
[50] Treas. Reg. section 1.6664-4(e)(2).

Taxpayer did not seek a written opinion, the regulation does not require a written opinion. To the contrary, the regulation provides that a corporation acts in good faith if the corporation relies on an advisor's opinion as long as the opinion is based on the pertinent facts and authorities and the advisor concludes that there is more than a 50 percent chance the position will be upheld. Here, Taxpayer's experienced team of employees considered all of the factors carefully and as a result of this internal analysis concluded that there was a more than 50% chance of the position being upheld.

Nor can it be contended, either for purposes of the negligence penalty under section 6662(c) or the substantial understatement penalty under section 6662(d), that a significant purpose of the overall plan or entity was avoidance or evasion of federal income taxes within the meaning of section 6662(d)(2)(C)(ii) or Treasury Regulation section 1.6662-4(g)(2). Taxpayer's core business is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products it sells. It is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns. Consistent with this core aspect of its business operations, Taxpayer entered into this transaction to earn an enhanced yield that compared favorably with other short-term risk-adjusted investments. The enhanced yield was commensurate with the greater risks arising from the more complex, illiquid partnership structure. Taxpayer viewed its investment as being similar to an investment in an asset-backed security, which allows investors to maintain spreads while improving the credit quality of their investment. Likewise, the pool of taxable and tax-exempt assets held by the entity permitted Taxpayer to earn a yield comparable to BBB corporate securities while the structure raised the credit quality of the investment to the AA level. Taxpayer's purpose, therefore, was to realize the economic objective of earning an overall BBB yield over the two-year term of the partnership investment but with a higher overall credit quality estimated at AA-. The significance of the tax-exempt characteristic of the previously taxed income, therefore, was not that it avoided federal income tax, but that it increased the Taxpayer's yield on the investment. Moreover, availing oneself of the tax benefits provided by the Internal Revenue Code, such as the previously taxed income benefit provided by section 959, in a manner consistent with the statute and Congressional purpose does not constitute a tax avoidance purpose.[51]

*6. Realistic possibility of being sustained on its merits defense*

Pursuant to Treasury Regulation 1.6694-(2)(b), a position is considered to have a realistic possibility of being sustained on the merits if a reasonable and well-informed analysis by a person knowledgeable in tax law would lead such a person to conclude that the position has approximately a one in three, or greater, chance of being sustained on its merits. The standards used to make this determination are the standards used to determine whether substantial authority exists for purposes of the substantial underpayment penalty.[52]

---

[51] Treas. Reg. §1.6662-4(g)(2)(ii).
[52] Treas. Reg. section 1.6694-2(b)(1), (2).

The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[53] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[54] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[55]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the realistic possibility standard is generally satisfied. Although there may be different interpretations of guidance, a well-reasoned construction of the applicable provisions also establishes a realistic possibility standard for the position taken.

Here, the Taxpayer and the Service disagree on the treatment of the investment transaction, but that disagreement does not automatically nullify the efforts the Taxpayer undertook to analyze the transaction. Nor does it render the analysis unreasonable. Because the Taxpayer has met the requirements for having a reasonable basis for its position, has shown reasonable cause and that it acted in good faith, and has substantial authority for its position, the Taxpayer has shown it has a realistic possibility of being sustained on the merits.

**Law**

**B. Substantial understatement penalty**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(2) provides a substantial understatement of income tax results in the 20 percent penalty. A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Section 6662(d)(2)(B) allows a reduction of the amount understated for items (i) for which there is or was substantial authority for such treatment or (ii) that are adequately disclosed and for which a reasonable basis for the tax treatment exists. This reduction is not allowed, however, to any item of a corporation that is attributable to a tax shelter. A tax shelter is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose is the avoidance or evasion of Federal income tax.[56]

The penalty for a substantial understatement applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried that is attributable to a "tainted

---

[53] Treas. Reg. section 1.6662-4(d)(3)(iii).
[54] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[55] Treas. Reg. section 1.6662-4(d)(3)(ii).
[56] IRC section 6662(2)(C).

item" for the year in which the carryback of the loss, deduction, or credit arises. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Tainted items are those for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit year.[57] In the case of a tax shelter item, a tainted item is any item for which there is not both substantial authority and a reasonable belief that the tax treatment is more likely than not the proper treatment.[58]

## Analysis

*1. Substantial authority defense*

The "substantial authority" standard is an objective standard. This standard is less stringent than "more likely than not" (i.e., greater than 50 percent chance of succeeding in litigation) but stricter than the "reasonable basis" standard.[59] To determine whether substantial authority exists, the authorities must be examined. The weight of the authorities supporting the treatment must be substantial in relation to the authorities supporting a contrary position. Substantial authority is measured at the time the return is filed or on the last day of the taxable year to which the return relates.[60]

Among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[61] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[62] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[63]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. Substantial authority for the transaction exists.

*2. Adequate disclosure and reasonable basis defense*

*a. Adequate disclosure*

Pursuant to Treasury Regulation sections 1.6662-4(e) and (f), disclosure is adequate if made on Form 8275 or Form 8275-R or in accordance with an annual revenue procedure.

---

[57] Treas. Reg. section 1.6662-4(c).
[58] Treas. Reg. section 1.6662-4(c)(3).
[59] Treas. Reg. section 1.6662-4(d)(2).
[60] Treas. Reg. section 1.6662-4(d)(3)(iv)(C).
[61] Treas. Reg. section 1.6662-4(d)(3)(iii).
[62] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[63] Treas. Reg. section 1.6662-4(d)(3)(ii).

Revenue Procedure 2001-52[64] applies to tax returns filed on the 2001 tax form and addresses M-1 items. Additional disclosure of facts relevant to, or positions taken with respect to M-1 items is unnecessary provided that

1. the amount of the deviation from the financial books and records is not the result of a computation that includes the netting of items, and

2. the information provided reasonably may be expected to apprise the Service of the nature of the potential controversy concerning the tax treatment of the item.[65]

Additionally, forms and attachments must be completed in a clear manner and in accordance with their instructions. Amounts entered on forms must be verifiable.

As stated above, the Taxpayer did not file Form 8275 or 8275-R because it did not conclude that the investment transaction was contrary to any rule or regulation. However, the Taxpayer did report a separate M-1 item.[66] The item was reported in tax years 2000 and 2001 as "Previously Taxed Income" on line 7 of Schedule M-1. This adjustment is not the result of netting.

The seminal case establishing the standard to measure whether an item was adequately disclosed is *Schirmer v. Commissioner.*[67] The *Schirmer* case is one of many hobby loss cases. In *Schirmer*, the taxpayer was a mechanical engineer who also owned a farm. The issue before the court was whether the farming activity was entered into for profit. The court held that the farm was a hobby activity. The taxpayer reported the farm's income and expenses on Schedule F and filed Form 4562 for depreciation and amortization deductions.

The court found that the inclusion of the schedules with the return did not constitute adequate disclosure. The information provided "was insufficient to enable respondent to identify the potential controversy involved here, that is whether petitioner engaged in the activity for profit."

None of the cases concluding that the disclosure was adequate directly address an M-1 adjustment. Instead, the cases deal with forms or statements attached to the return.[68]

---

[64] Revenue Procedures 99-41, I.R.B. 1999-46 and 2001-11, 2001-1 C.B. 275 apply to tax years 1999 and 2000, respectively.

[65] Section 4.01 of (3) Rev. Proc. 2001-52, I.R.B. 2001-46

[66] The Taxpayer reported the M-1 adjustment as a separate line item in years 2000 and 2001. In 1999, the Taxpayer had not received a distribution from the LLC. However, income had been accrued for statutory purposes, and a resulting M-1 adjustment was made. The adjustment was not separately itemized. However because the Taxpayer has substantial authority for its position, the substantial understatement penalty should not apply to tax year 1999.

[67] 89 T.C. 277 (1987).

[68] See *Elliot v. Commissioner*, 73 T.C.M. 3197 (1997) (adequate disclosure where taxpayer attached Form 8275 claiming deduction under section 1244 but abandons that position to deduct the losses as bad debts); *Henry v. Commissioner*, 73 T.C.M. 1769 (1997) (attaching a statement indicating options with a zero basis was adequate to apprise the Service of the issue of proper reporting as long term capital gain);

Here, however, the M-1 adjustment was clearly set out as a separate line item, including which company in the affiliated group earned the income. The adjustment was clearly identified as "Previously Taxed Income." This should be considered more than enough to "to identify the potential controversy involved," i.e. whether the income was previously taxed income and therefore excludable from taxable income.

*b. Reasonable basis*

In accordance with Treasury Regulation section 1.6662-4(e)(2), disclosure is only effective in relation to the understatement penalty where there is also a reasonable basis, as defined in Treasury Regulation section 1.6662-3(b)(3). In accordance with Treasury Regulation section 1.6662-3(b)(3), this standard is a relatively low standard. It is significantly higher than frivolous or patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[69] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[70] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[71] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[72]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied, and the understatement penalty should not apply. The Taxpayers adequately disclosed the

---

*Dibsy v. Commissioner*, 70 T.C.M. 918 (1995) (reporting business income from a liquor store on Schedule C and a "transaction involving the same liquor store which produced zero capital gain as reported on Schedule D" was adequate to alert the Service to identify the controversy – whether the taxpayers engaged in a tax free exchange under section 1031); *Mayhew v. Commissioner*, 63 T.C.M. 1984 (1992) (adequate disclosure was found where the taxpayer reported a capital gain resulting from the sale of a partnership interest even though the court held the income to be ordinary); *Rebecca K. Crown Income Charitable Fund v. Commissioner*, 98 T.C. 327 (1992) (filing Forms 5227, 1041-A, and 1041 adequately disclosed that the trust was structured as a charitable lead trust, that an annual annuity of $975,000 was required to be paid, and that the trust claimed charitable deductions in excess of the annual annuity amount, putting the Service on notice that the claimed deductions might exceed the amounts paid to charitable beneficiaries under the terms of the trust agreement for purposes of section 642(c)); *Zermeno v. Commissioner*, 62 T.C.M. 1155 (1991) (statement explaining interest income was not effectively connected income was adequate); *Pinson v. Commissioner*, 59 T.C.M. 554 (1990) (adequate disclosure where statement disclosing underlying facts and other documents outlining their legal position and pursuit of civil recourse was sufficient for a theft loss deduction).

[69] Treas. Reg. section 1.6662-4(b)(3).
[70] Treas. Reg. section 1.6662-4(d)(3)(iii).
[71] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[72] Treas. Reg. section 1.6662-4(d)(3)(ii).

item's tax treatment in the tax returns filed for the years in question, and there was a reasonable basis for the tax treatment of this item by the Taxpayers.

3. *Understatement Insufficient to Warrant Penalty*

As provided in section 6662(d)(1)(B), for there to be a substantial understatement of tax, the amount by which the tax is understated must exceed the lesser of (i) 10% of the tax required to be shown on the return, or (ii) $10,000. After reduction of the understatement for any taxable year by the portion attributable to an item for which there was substantial authority and for any item that was adequately disclosed and for which there was a reasonable basis, the remaining portion of such understatement does not exceed the lesser of 10% of the tax or $10,000. Therefore, such remaining portion is not "substantial" within the meaning of section 6662(d)(1)(B) and imposition of the accuracy-related penalty of section 6662(a) by virtue of section 6661(b)(2) is not justified.

In conclusion, all of the facts and circumstances demonstrate that the Taxpayers have met the requirements for a complete reduction of the amount of any claimed understatement attributable to the investment transaction. For the reasons stated above, no penalty should be assessed against the Taxpayers.

PRINCIPAL LIFE INSURANCE COMPANY

STATUTE OF LIMITATIONS ISSUE

TAX YEAR 1998

$45,001,157
Alternative Claim $5,474,638

Principal Life Insurance Company ("Principal") requests refund of taxes and penalties paid plus assessed interest paid with respect thereto and statutory interest as allowable by law for tax years 1996, 1997, 1998, 1999, and 2000 because the Service did not timely assess tax in those years.

## I. Facts Upon Which Claims For Refund Is Based.

### A. Limitations Periods and Statutory Notices of Deficiency.

Pursuant to extensions of time granted by Principal to IRS (Forms 872), the periods within which assessments could be made for the taxable years 1999 and 2000 were set to expire on December 31, 2004. On October 28, 2004, as it was about to wrap up its examination of Principal's returns for the taxable years 1999-2001, IRS served on Principal a "designated summons" under IRS §6503(j) relating to the years 1999 and 2000. On the same date, IRS served a similar designated summons on Deutsch Bank as a third-party recordkeeper. The summonses called for return dates of November 9 and December 15, respectively. These designated summonses would have kept the limitations periods for 1999 and 2000 open during any judicial summons enforcement proceeding and for a period of at least 60 days thereafter.

On November 9, 2004, Principal produced 5,600 pages of documents to IRS in response to the summons and indicated it would produce more before December 15. By December 8, it had made three submissions totaling 10,000 pages of documents, including three privilege logs identifying documents not produced because of invocation of the attorney-client privilege. On the date of its third and final submission, December 8, Principal advised IRS that it believed it was then in full compliance with the summons issued to it. On December 15, Deutsch Bank submitted to IRS in NYC seven boxes containing 13,000 pages of documents and indicated it would produce more in the months that followed.

IRS chose not to initiate any judicial summons enforcement action with respect to any remaining documents. Instead, on December 29, 2004, it issued to Principal its statutory notices of deficiency (90-day letters) asserting deficiencies and penalties for the taxable years 1996-2000 (the years 1996 through 1998 remained open for this purpose because the NOL from 2001 had been carried back to them). The 90-day period in which Principal could have contested the deficiencies in Tax Court, being the same 90-day period in which IRS was prohibited from making an assessment and during which the running of the statute of limitations was suspended,

would have expired on March 29, 2005. Therefore, as a result of the additional 60 days tacked on to the limitations period by virtue of §6503(a), the statute of limitations on assessments for 1999 and 2000 would typically (but for the January 28, 2005 payments by Principal hereinafter described) have expired on May 31, 2005.

As indicated above, 2001 was a loss year for Principal that generated an NOL carryback to 1996-1998, and, through the quick refund procedure, Principal received refunds of taxes paid for the years 1996-1998 shortly after filing its 2001 return on June 24, 2002.

IRS' statutory notice of deficiency issued on December 29, 2004 asserted proposed assessments of tax of $165 million and $129 million for 1999 and 2000, respectively, but it also asserted proposed assessments of $9 million, $22 million, and $38 million for 1996, 1997, and 1998 (plus, in each case, penalties). These deficiencies asserted for 1996, 1997, and 1998 were due to disallowance of carrybacks from 1999, 2000, and 2001. According to this 90-day notice (p. 19), $19.7 million of Whispering Woods previously-taxed income for 2001 and $4.3 million of Whistling Pines previously-taxed income for 2001 were being disallowed and, alternatively, the Whispering Woods $48 million basis adjustment in 2001 was being disallowed, resulting in decrease of the 2001 carryback.

While there was no tax attributable to Principal's operations for 2001 (because of the NOL for that year), there was $1 million in tax due for 2001 as a result of carryforward of the §453A interest on deferred tax issue from 1991 that was recently tried in the Court of Federal Claims. Pursuant to an application for extension, an extension of time to file the 2001 return had been granted through September 15, 2002, and, as stated above, Principal filed its 2001 return on June 24, 2002. It later filed an amended return for 2001 on September 13, 2002. Accordingly, the regular three-year statute of limitations on assessment for 2001 would not have expired until June 24, 2005. IRS' statutory notice of deficiency (90-day letter) for the §453A interest in 2001 was issued on March 1, 2005.

**B. Deposits/Payments.**

On January 13, 2005, through five wire transfers each relating to specific taxable years 1996-2000, Principal deposited $444,000,000 to a U.S. Treasury Tax & Loan Account in Minneapolis, and instructed IRS by letter that such amount be treated as a deposit in the nature of a cash bond in accordance with IRC §6603 and Rev. Proc. 84-58.

On January 28, 2005, Principal sent a letter to IRS requesting it to apply the deposit for each year to payment of the federal income tax, interest and penalty in the following amounts for each year:

| Year | Tax | Penalty | Interest | Total |
|---|---|---|---|---|
| 1996 | $ 8,806,758 | $ 961,609 | $ 2,032,704 | $ 11,801,071 |
| 1997 | $ 22,097,933 | $ 780,951 | $ 1,728,429 | $ 24,607,313 |
| 1998 | $ 37,509,413 | $ 7,491,744 | $ 6,303,004 | $ 51,304,161 |
| 1999 | $164,888,638 | $10,848,700 | $24,358,720 | $200,096,058 |
| 2000 | $128,727,605 | $ 7,294,419 | $19,182,961 | $155,204,985 |
| Total | $362,030,347 | $27,377,423 | $53,605,821 | $443,013,591 |

## C. IRS Transcripts and Assessments.

IRS has provided two sets of transcripts for each of the years 1996-2001. The first set shows an issuance date of May 27, 2005 for the tax years 1996 and 1997 and an issuance date of June 2, 2005 for the tax years 1998, 1999, 2000, and 2001. The last entry on all of them (except 2001) is dated April 14, 2005, and, while they all show the cash bond deposit on January 13, 2005, none of them shows any assessment of the deficiencies asserted in the 90-day notices. The last entry date on the 2001 transcript is dated April 28, 2003.

The second set of IRS transcripts is dated July 18, 2005. These transcripts show entries dated May 27, 2005 (presumably purported assessments made on that date) as follows:

| | |
|---|---|
| 1996 | (none) |
| 1997 | $23,727,866 |
| 1998 | 45,829,523 |
| 1999 | 175,737,338 |
| 2000 | 136,550,585 |

These amounts correspond roughly to the payments of tax and penalties as set forth by Principal in its January 28, 2005 letter and the table set forth above. However, for 1999 and 2000, the entries purporting to be assessments on May 27, 2005 follow other entries dated June 27, 2005.

In the second set of transcripts dated July 18, 2005, there is an entry for 1999 and 2000 that states "ASED: 05-30-2005." "ASED" apparently stands for "Assessment Statute Expiration Date."

Curiously, the transcripts for 1996, 1997, and 1998 each contain an entry dated April 15, 2005 that shows a "New ASED" of April 14, 2008 and the front page of each of these three transcripts also shows an ASED of April 14, 2008. The relevance of the April 14, 2008 date has not been determined. To the contrary, the "ASED" for these years would appear to be tied to the statute of limitations for the carryback year, 2001, and that statute of limitations would have

expired on July 30, 2005. That is the date that is 60 days (per §6503(a)) after the expiration of the 90-day period during which IRS was prohibited from making an assessment by virtue of its statutory notice for 2001 issued on March 1, 2005.

The transcript for 2001 shows an ASED of August 18, 2005. The $1 million of tax for 2001 attributable to the §453A issue was the subject of IRS' statutory notice of deficiency (90-day letter) for 2001 issued on March 1, 2005, and IRS claims that it made a timely assessment of this tax on May 27, 2005. However, the IRS transcript dated July 18, 2005, shows what appears to be two assessments for 2001 made on June 29, 2005, one for the $1,030,548 tax payment that Principal made on March 29, 2005, and one for what appears to be $184,643 in interest.

## II. Legal Analysis Upon Which Claims For Refund Is Based.

### A. Statutory Provisions.

IRC §6213(a) is the provision that prohibits IRS from making any assessment of tax against Principal for these years during the 90-day period referred to in the statutory notice, and §6503(a) is the provision under which the running of the statute of limitations for making assessments is suspended during the prohibition period and **for a further period of 60 days thereafter**. Therefore, under IRC §6503(a), issuance by IRS of the statutory notice of deficiency for 1999 and 2000 on December 29, 2004 would typically have extended the limitations period for making an assessment for those years (assuming Principal filed no petition in the Tax Court) to May 31, 2005 (60 days after the close of the 90-day suspension period). However, under §6213(b)(4), the prohibition on assessments by IRS came to an end on January 28, 2005, because Principal on that date paid the deficiencies for 1999 and 2000 asserted in the statutory notice. IRS, therefore, could only have made assessments of the asserted deficiencies for those years against Principal for 60 days after January 28, 2005, that is, until March 31, 2005. Therefore, even if the assessments for 1999 and 2000 were made on May 27, 2005, as purportedly shown on the transcripts, they were made after the statute of limitations for those years had expired and Principal is entitled to have all of the remittances for those years refunded.

If the assessments for 1997 and 1998 were made on May 27, 2005, as the July 18, 2005 transcript purports to show, those assessments would have been timely because, notwithstanding the 60-day window IRS had to make assessments for 1999 and 2000 following Principal's payment of taxes on January 28, 2005, the limitations period on assessments for 1996, 1997, and 1998 would not have expired until three years from the date of filing of the return for the carryback year, 2001, that is, until June 24, 2005. IRC §6501(h). Moreover, for the reasons stated in the preceding section, it can be argued that the limitations period for 2001 did not actually expire until July 30, 2005, and if such were the case, an assessment for 1997 and 1998 made on May 27, 2005, and an assessment for 2001 made on June 29, 2005 would have been timely.

Furthermore, even if the foregoing analysis proves correct showing timely assessments for 1997 and 1998, as shown on the second set of IRS transcripts dated July 18, 2005, the assessments would have fallen short in amounts and Principal would still be entitled to refunds as follows:

| Year | Principal's Remittance | Putative Assessment | Refund Due |
|---|---|---|---|
| 1996 | $11,801,071 | -0- | $11,801,071 |
| 1997 | 24,607,313 | $23,727,866 | 879,447 |
| 1998 | 51,304,161 | 45,829,523 | 5,474,638 |
| Total | $87,712,545 | $69,557,389 | $18,155,156 |

**B. Suit For Refund.**

Under IRC §7422(a), a suit for refund may be brought for a tax "illegally assessed or collected" and for any penalty "collected without authority," but only after a claim for refund has first been filed. Such suits may be brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. §1491, or in federal district court under 28 U.S.C. §1346(a). Section 6402(a) directs that any overpayment shall be refunded, and §6401(a) states that the term **"'overpayment' includes that part of the amount of the payment of an internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto."** (Emphasis added.)

Under §§6401 and 7422, Principal may combine its positions on the merits of the issues with its claim that it is entitled to refund because the IRS failed to properly assess the taxes at issue. *Cohen v. U.S.*, 995 F.2d 205 (Fed. Cir. 1993). In the *Cohen* case, the Federal Circuit noted that -

> Plaintiff's position rests on two independent grounds. They claim entitlement to a refund because the IRS failed to timely assess the asserted deficiency for 1980, and even if the assessment had been timely, because the IRS improperly disallowed the losses claimed for 1980.

In *Cohen,* the court held that the taxpayer was entitled to have its payment refunded because the IRS assessment made after the payment was not timely, stating "the chips must lie where they have fallen." *Cohen, supra,* at 209.

In the Supreme Court's seminal decision in *Rosenman v. U.S.*, 323 U.S. 658 (1945), it was held that the date of assessment is the key date as it defines the tax obligation. In *New York Life Ins. Co. v. U.S.*, 118 F.3d 1553 (Fed. Cir. 1997), the Federal Circuit applied both *Rosenman* and *Cohen* to uphold the Court of Federal Claims' decision that the taxpayer was entitled to a refund where no timely assessment by IRS had been made.

The 8th Circuit has also applied *Rosenman* to focus on the date of the assessment as the key date, holding that the 2-year statute of limitations on a claim for refund began on the later date of the assessment, rather than on the earlier date that the remittance was made. *Dubuque Packing Co. v. U.S.*, 233 F.2d 453 (8th Cir. 1956). A district court case in this circuit, like the Federal Circuit in *Cohen,* applied the *Rosenman* rationale to hold that where IRS mailed a notice of deficiency with the limitations period and taxpayer mailed her check for the amount claimed in the notice but the tax was not assessed until after the statute of limitations had expired, the taxpayer was entitled to have the amount of her payment refunded. *Goetz v.U.S.*, 286 F.Supp. 128 (W.D. Mo. 1968).

The 5th Circuit has adopted the same "bright-line test" or "*per se*" test as the 8th Circuit, to the effect that whenever the taxpayer has disputed liability for a deficiency, there can be no payment of taxes until there has been a formal assessment. *Thomas v. Mercantile National Bank,* 204 F.2d 943 (5th Cir. 1953). Because "there was no deficiency assessment [until August 17, 1945], and no liability on the part of the taxpayer [despite the revenue agent's proposed deficiency], and consequently nothing to pay . . . the sum deposited . . . on August 2, 1945, was merely an advance deposit to cover additional tax liability expected to arise thereafter." *Id.* at 944. In *Ford v. U.S.*, 618 F.2d 357 (5th Cir. 1980), the 5th Circuit followed its precedent in *Mercantile National Bank.*

III. Conclusion

Because it appears that the Service failed to make timely assessments for tax years 1996, 1997, 1998, 1999 and 2000, Principal requests a refund of tax and penalty paid, plus assessed interest paid with respect thereto and statutory interest as allowable by law.